UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

K.C. and M.T., individually and on behalf of J.C.T.,

Plaintiffs,

-against -

**COMPLAINT**

ECF Case 7:16-cv-3138

CHAPPAQUA CENTRAL SCHOOL DISTRICT,

Defendant.

----------------------------------------------------------------- X

Plaintiffs K.C. and M.T., individually and on behalf of their minor son J.C.T. (known as "C.T."), bring this action pursuant to the Individuals with Disabilities Education (the "IDEA"), 20 U.S.C. 1415 *et seq.*, Article 89 of the New York State Education Law, Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794 *et seq.* and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the regulations promulgated under these laws, to review the final administrative decision of the New York State Review Officer ("SRO") regarding the provision of a free, appropriate public education ("FAPE") to their disabled child.

## PRELIMINARY STATEMENT

C.T. is a severely emotionally disturbed child who was improperly kept by the Defendant in a large, mainstream general education setting during his sixth and seventh grade years, against the recommendations of his parents and clinicians and in the face of grave concerns expressed privately by teachers and staff. Although he is an intelligent and sensitive child, due to his disability C.T. was unable to access his education in this insufficiently supportive placement. The

Defendant school district repeatedly downplayed his interfering behaviors, misrepresented his capacity to engage in school activities, and failed to take any meaningful action to arrest his declining functioning. The Defendant hid critical evidence of the comprehensive range of this decline from his parents and doctors, so that his parents only learned years later: that C.T. missed 197 classes during seventh grade due to his disability, that he spent much of the year leaving the class when any demands were placed on him, that he behaved in a bizarre and sometimes frightening manner towards his classmates and teachers, and that he was not expected to meet grade level standards despite his IEP requirement that he do so.

Plaintiffs pursued an administrative due process review to address their claims that the Defendant failed to provide C.T. with a free and appropriate public education ("FAPE") for the 2011-2012 and 2012-2013 school years. They sought compensatory education to redress the Defendant's failure to educate C.T. during 2011-2012, and tuition reimbursement to compensate the parents for the unilateral placement of C.T. during 2012-2013.

The first tier impartial hearing officer ("IHO") ruled in Plaintiffs' favor on all claims. The New York State Education Department's second tier State Review Officer Justyn Bates (the "SRO") reversed. This action seeks *de novo* judicial review of their claims and reversal of the SRO's decision on the ground that his analysis and decision contain serious mistakes of law and errors of fact, that the SRO overlooked substantial evidence in the file and reversed without basis a number of the IHO's credibility determinations, and that because the SRO decision does not implicate any educational policy determinations or consider basic, material facts set forth in the record, it is not due deference.

Plaintiffs seek a judgment that Defendant's actions failed to provide C.T. with a FAPE

meeting the requirements of either the IDEA or Section 504, and that the Defendant's actions constituted a discriminatory deprivation of C.T.'s access to education commensurate with that provided to his non-disabled peers.

## JURISDICTION AND VENUE

1.      Pursuant to the IDEA, 20 U.S.C. §§ 1415(i)(2) and (3), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) and 28 U.S.C. §§ 1331, 1343 and 1367, this Court has subject matter jurisdiction of this action without regard to the amount in controversy, as claims are asserted pursuant to the Constitution and Laws of the United States; pursuant to 28 U.S.C. § 1343, which confers original jurisdiction on the district courts to recover damages or secure equitable relief under any Act of Congress providing for the protection of civil rights, and pursuant to 20 U.S.C. § 1415(i)(2) and (3).

2.      This Court has supplemental jurisdiction to adjudicate New York state law claims which arise out of the same acts as the claims asserted under federal law. 28 U.S.C. § 1367.

3.      If successful, Plaintiffs are entitled to costs and attorney's fees under 20 U.S.C. § 1415(i)(3) and 29 U.S.C. § 794a.

4.      Venue is proper in the Southern District of New York as the actions and omissions giving rise to Plaintiffs' claims occurred in this district. 28 U.S.C. § 1391(b).

## EXHAUSTION

5.      Plaintiffs pursued their IDEA claims through the impartial hearing process and the IHO rendered a decision in this matter.

6.      This action is timely commenced within four months after the date of the SRO

decision rendered on January 7, 2016, pursuant to 20 U.S.C. §1415(i)(2)(B) and New York Education Law § 4404(3)(a).

7.      Plaintiffs' Section 504 and ADA claims were referred by the IHO to the Defendant's Assistant Superintendent, but Defendant never adjudicated these claims.

8.      Neither party appealed the IHO's decision declining jurisdiction over the Section 504 or ADA claims. The New York Education Law makes no provision for State-level administrative review of IHO decisions with regard to Section 504 or ADA disability discrimination claims. Educ. Law § 4404[2]. These claims are ripe for adjudication in this action.

## PARTIES

9.      Initials are used throughout this Complaint to preserve the confidentiality of the infant Plaintiff in conformance with the privacy provisions of the IDEA, codified at 20 U.S.C. § 1417(c), and with the Family Educational Right to Privacy Act ("FERPA"), codified at 20 U.S.C. § 1232(g).

10.     Plaintiff C.T. was born in 1999. He is properly classified by the Defendant as a disabled student with emotional disturbance. He is entitled to receive special education services under the IDEA, and is entitled to the protections outlined in Section 504 and Title II of the ADA.

11.     Plaintiffs K.C. and M.T. are the parents of Plaintiff C.T.

12.     Defendant Chappaqua Central School District ("Defendant" or "District") maintains its principal place of business at 66 Roaring Brook Road, Chappaqua, New York 10514, in Westchester County.

13.     Defendant is a "local educational agency" as defined by the IDEA, pursuant to 20 U.S.C. § 1402(19). As a condition of its receipt of federal financial assistance Defendant is obligated to provide educational and related programs and services to the students in its

jurisdiction, in compliance with applicable federal and state statutes and regulations and the United States Constitution, and is subject to the requirements of 20 U.S.C. § 1400, *et seq.*, 29 U.S.C. § 794, 42 U.S.C. § 12101, *et seq.,* and the regulations promulgated thereunder.

14.     At all times relevant to this Complaint, the Plaintiffs resided in Chappaqua, New York, within the geographical boundaries of the Defendant's school district zone.

## STATEMENT OF FACTS

15.     Student C.T., a bright and sensitive child with severe mental illness, attended the District's schools from kindergarten through seventh grade.

16.     His initial diagnosis was attention deficit disorder, but as his capacity to engage in any regular academic or social activities declined he was diagnosed with early onset bipolar disorder in middle school.

17.     C.T.'s social issues, avoidance of fine motor activities and distractibility have been documented concerns since preschool.

*Elementary School*

18.     During third grade, C.T. grew sharply more avoidant of all school tasks. He was unable to read chapter books independently, and was a year and a half delayed in his reading skills.

19.     C.T.'s parents initiated a long-term therapeutic relationship between their son and clinical psychologist Marta Flaum, Ph.D., who diagnosed him with ADHD.  His pediatrician advised that he be medicated with Concerta.

20.     In third grade, at the request of Defendant, his mother completed a BASC-2 Structured Developmental History, and noted his significant problems with focus, attention, and incontinence, that many of his peer interactions made him angry, and that his self-esteem was plummeting.

21. Dr. Flaum warned Defendant when C.T. was in third grade that he was weak in all skill areas, could not do any independent work, and that interventions were urgently needed to address his emotional fragility and unevenly developing skills, as the window was closing in which he could easily catch up to his peers.

22. The Defendant classified C.T. as "Other Health Impaired" in third grade but failed to successfully address the gap in his academic skills or his behavioral and emotional needs.

23. These interfering behaviors were an unfortunate hallmark of C.T.'s school days, worsening over time.

*C.T. Required Intensive Psychological Interventions Starting at Age Nine*

24. By the age of nine, C.T. was seeing a pediatric psychiatrist and a neurologist. When Concerta and Vyvanse, prescribed for attentional issues, began causing tics he was prescribed non-stimulant Strattera, which in turn caused hallucinations and paranoia.

25. C.T.'s grades dropped. By fifth grade, his report card reported on his inability to do his homework, difficulty completing tasks and alienation from his classmates.

26. His fifth grade special education teacher wrote that she viewed him as a target of bullying, that he was barely tolerated by his classmates and that he wasn't doing well in his classes.

27. C.T.'s parents only learned of his special education teacher's views after Defendant was compelled to produce her email years later during the due process hearing.

28. Not only was this report concealed from his parents, but the Defendant made no effort to address that his special education teacher saw him as a likely target for bullying.

29. Although they were not informed by Defendant that his teacher saw him as vulnerable to bullying, his parents and C.T.'s doctors repeatedly begged the school district to provide him with additional academic and emotional supports. Nothing done by the school checked

his dramatic decline.

30.     C.T.'s diagnosis was changed to early onset bipolar disorder during the summer after fifth grade. He was prescribed Abilify, which caused him to suffer a dramatic weight gain of two clothes sizes in one month.

31.     C.T. has continued to gain weight. By the time he was 15 years old, he weighed more than 300 pounds at a height of 5'6".

***Sharp Decline in Functioning Began in Sixth Grade***

32.     At the beginning of sixth grade, the Defendant acknowledged C.T.'s "substantial regression" over the summer.

33.     In the first weeks of sixth grade, Defendant also acknowledged that C.T. was unable to work independently, was defensive when asked to work, that he presented with obvious vocal and facial tics, and that all of his teachers reported on his significant lethargy in the classroom and his major limitations in providing any coherent contributions to the lessons.

34.     Although Defendant recommended the development of an "updated" behavior plan at the beginning of sixth grade, this was not done.

35.     C.T.'s alarming behaviors escalated through sixth grade and became increasingly disruptive of his learning and the learning of his peers. Defendant recorded that he was unable to stop tapping his pencil, frequently made alarming animal noises and pounded or thumped his chest throughout the day.

36.     C.T. also declined on standardized assessment measures. C.T.'s Full Scale IQ plummeted on a District psychological evaluation to 82 in December 2010 from 102 just three years earlier.

37.     Defendant's sixth grade special education teacher reported C.T. only wrote down

half of what was required of him, did not work until prompted 1:1, did not participate in class; and repeatedly put his head down on the desk with his eyes shut.

38.     On the BASC, this same teacher rated C.T.'s behaviors in the "*at risk*" range for *aggression, conduct problems, anxiety, withdrawal, learning problems, and atypicality*, in the *"clinically significant"* range for *depression, somatization and internalizing problems,*

39.     During sixth grade, teachers and staff also reported that C.T. had great difficulty managing his feelings of frustration and anxiety, which led to him shutting down, displaying immature social behaviors such as speaking in a high-pitched childlike voice, and utilizing non-verbal gestures that were "off-putting to his peers and adults."  In general, he was noted to be unable to "link his behavior to social acceptance."

40.     Despite the stark deficiencies of C.T.'s sixth grade functioning, none of the measures required by law or even common sense were initiated by the District. He was maintained in large, mainstream classes of up to 27 children with special education support which was limited, incoherent and piecemeal, and which failed to address behavioral and psychological needs which affected every aspect of his school day.

41.     District teachers and staff knew that C.T. was struggling and admitted as much to one another in email communications that were concealed from C.T.'s parents and doctors.

42.     His own aide wrote in an internal email to C.T.'s teacher that "*it breaks my heart to know [C.T.] is suffering*." This communication was withheld from C.T.'s parents until years later, following the initiation of the impartial hearing.

43.     Although the Defendant reported on C.T.'s marked regression during summer 2010, no regression assessment was conducted before summer 2011 and he received no services or support during that or any other summer.

*C.T. Was Hospitalized Repeatedly During the Summer of 2011*

44.     During the summer before seventh grade, when C.T. was 12 years old, his parents sent him to day camp.

45.     He became increasingly dysregulated and aggressive. He had begun imagining personal slights, which led to aggressive physical responses, such as breaking and throwing things.

46.     That summer, he was hospitalized in the partial day program at Four Winds Psychiatric Hospital for two and a half weeks.

47.     Shortly after his discharge, he was hospitalized again, this time as an inpatient when his aggressive and reactive behavior failed to abate.

48.     He was incontinent during the night, at the hospital, and he required 24/7 coverage and supervision.

49.     His parents informed the District of these hospitalizations as they did "*anytime anything happened with C.T.*"

*2011-2012: C.T.'s Seventh Grade Year Was a Disaster*

50.     Despite his dramatic deterioration, C.T.'s seventh grade IEPs were virtually identical to his sixth grade IEP, even after the declines he showed under this IEP program, and his summer hospitalizations. He was kept in large regular education classes pursuant to an IEP that required him to engage in grade level academics, and offered only counseling with a school guidance counselor.

51.     This was even less effective for him in the face of the increased academic and social demands of the higher grade.

52.     The District acknowledged, directly to the parents and indirectly in confidential emails and reports only revealed years later, that C.T. was not able to access his education,

frightened and alienated other students, and wandered the halls much of the day.

53.     Nothing significant was done to address this, and the concerns of his parents and clinicians were brushed aside, although they repeatedly requested that Defendant transfer C.T. into a smaller therapeutic school placement.

54.     Defendant reported on C.T.'s bizarre nonverbal gestures, his use of a high-pitched voice, the fact that he banged on desks, and fidgeted, and that his behavior "*interfere[d] with his ability to attend to instruction*".

55.     His ability to engage academically plummeted as well. He raged and tantrumed when asked to do any homework.

56.     His out-of-control behaviors paralyzed the family, and police were called to their home on four different occasions during the school year when he repeatedly became violent and aggressive.

57.     His parents informed Defendant each time the police were called, but in the mother's words "*there was no response.  They never wanted to discuss what was really happening.*"

58.     His parents trained C.T.'s younger sister, by using a "safe word", to flee the room when C.T. became aggressive at home. They were forced to hide all the kitchen knives in the house.

59.     C.T. also began eating compulsively at school, despite the purported supervision and support of a one-to-one aide.

60.     His special education teacher admitted C.T.'s eating was an issue and that he ate all day and took food from others. The school psychologist acknowledged this as well. His guidance counselor noted he "*wanted always to eat. It was a tension that spread into school*."

61.     Years later, during the hearing, his parents learned for the first time that C.T. also went to the school nurse's office, unnoticed by his aide, and ate all the candy in her cabinet during this school year.

62.     The record is bereft of group counseling or behavioral plan or goals to address any of these behaviors.

### *C.T.'s Behaviors Grew Increasingly Bizarre During Seventh Grade*

63.     The Defendant repeatedly downplayed the extent of C.T.'s behaviors in school, contending that these only occurred at home.

64.     The actual record as established at the impartial hearing was that C.T.'s behavior and ability to engage in grade level school work was highly constrained by his serious mental illness.

65.     A GORT-4 reading test showed that C.T.'s Reading Accuracy and Fluency had fallen to the 2nd percentile, and his Reading Rate and Comprehension was only at the 16th percentile. His Oral Reading Accuracy was in the 4th percentile.

66.     His statewide ELA test results declined from a "3" in fifth grade to a "1" -- the lowest possible grade -- in seventh grade.

67.     His teachers reported that he could not work independently, and often left the class when asked to produce any work.

68.     C.T. began losing touch with reality.

69.     In February 2012, C.T. told his mother he had been bullied on the bus and demanded that she complain to the school. Video of the incident showed that C.T. had actually been the aggressor and had hit one of the other students in the face.

70.     The only intervention the Defendant recommended following his aggression toward

a fellow student was that C.T. should not ride the bus any longer.

71.     Although the parents attempted to discuss this aggressive and confused behavior with the CSE, and whether or how he could begin riding the bus again, the CSE refused to do so.

72.     No behavioral plan or program was developed to address this serious behavior.

73.     The IEP fails to even mention that C.T. was barred from access to the school bus, a public accommodation available to all of his peers. Nor was there any behavioral plan in the IEP or anywhere else designed to return him to the school bus.

74.     During the second half of seventh grade, Defendant repeatedly insisted to C.T.'s parents and clinicians that C.T. was functioning fairly well, that his IEP was fully implemented and that his placement in seventh grade regular education classes was appropriate.

75.     But records of internal discussions that were withheld from C.T.'s parents until years later reveal that Defendant was aware that C.T.'s needs far outstripped what could be managed in a mainstream setting.

76.     In February 2012 C.T.'s school counselor met privately with CSE Chair Wright to express his concern that C.T. could not manage in a mainstream setting and needed a therapeutic placement. No word of this discussion was shared at the CSE meeting that was held days later where the parents desperately begged for a therapeutic placement.

77.     In fact, the parents were unaware of this concern or his communication until after the commencement of this action.

78.     Also withheld from his parents were extensive notes made by his one-to-one aide during the middle of the 2011-2012 school year.

79.     These notes painted a vivid picture of C.T.'s stigmatizing behavior and of his utter inability to engage academically or socially in his class's activities:

- C.T. was **making hissing noises** in Math; his head was on the desk during class and as a result he missed all of Science;

- In Social Studies, he was **acting inappropriately**, making noises, and not paying attention to his group. Even the kids told him to stop… extraordinarily fidgety … not paying attention … very difficult for him to get started;

- **It's a waste for him to be here** - not only does not want to be here but hardly does any work at all … appeared to be on target but was not;

- English-not prepared … Math-did not do his homework… English-still no writing journal, Math - did only four problems … Social Studies - **wastes time, meanders around classroom, supposed to be partner work but ignoring them** … Math - lots of spacing out;

- Math - sat with his head down on the desk – **put his sweatshirt over his head** … Social Studies-seems really tired, started to **sleep in class – didn't do any work;**

- **Melt down during skills** –didn't want to listen to instruction at all … **Lots of randomly inappropriate vocalization and behavior.**

Emphasis added.

80.     At the end of seventh grade, in another internal document also concealed from the

parents, C.T.'s English teacher wrote that C.T.:

- Is not prepared to participate in class and doesn't have the required materials.

- He **calls me names and then takes his pencil and pretends to shoot me. He** also **makes inappropriate hand gestures. Some of the girls are getting upset** about this …

- In cases like this it seems as if **he'd rather sit there and try to frighten** the other children instead of just getting up and walking out of the room. **I've noticed his behavior worsen** over the past two weeks;

- I'm wondering why he puts himself front and center. It's not the right place for him since **all the other students in the class become distracted by his negative behavior**.  Then the girls all start to make faces at one another. **Unfortunately, he doesn't have anyone who wants to sit with him;**

- ***Socially things seem to have deteriorated for him***.

Emphasis added.

81.     No behavioral plan was developed to address his inappropriate vocalizations, that he was doing little to no work, that he slept in class or that he distracted and frightened his teacher and other students.

82.     During seventh grade C.T. told his guidance counselor that he "wanted to kill somebody", and used "aggressive" and "sexually explicit" language about students and teachers. The Defendant did not tell his parents or his doctors of this.

83.     The Defendant also withheld from his parents and his doctors the extent to which C.T. frequently wandered out of class at will throughout seventh grade and missed substantial amounts of schooling.

84.     The parents only learned years later, during the impartial hearing, that C.T. missed 197 classes during seventh grade.

85.     The Defendant's failure to timely inform the parents of C.T.'s excessive absences or to develop any specific plan to address and reduce them violated its own Comprehensive Student Attendance Policy, which mandates that:

> *"Whenever a student exhibits a pattern of unexcused absence, tardiness or early departure, **notice will be given to the parent(s)/guardian(s), in writing and/or by telephone communication**, and the student shall be conferred with by the classroom teacher and/or a guidance counselor regarding the pattern in an effort to remediate the underlying problem. **Notice shall also be given to the Building Principal who may address the matter with the student and/or his/her parent(s)/guardian(s)."***

Emphasis added.

86.     His parents also only learned, years later during the impartial hearing, that on the many occasions when C.T. left the classroom, all efforts to instruct him also ended.

87.     C.T.'s unsupervised roaming violated the Defendant's own policy which

emphasizes inclusive education in the mainstream for the majority of its students, the majority of the time.

88.     While emphasizing the benefits of inclusion, the Defendant's policy nonetheless recognizes that:

> *"[S]pecialized instruction outside the general education classroom may be necessary from time to time for some students."*

and that:

> *"**It is important for faculty to maintain records of instruction provided outside the classroom**, and to frequently review with colleagues, building administrators, and parents the instructional need requiring removal from a class. **If special education instruction outside the classroom is determined to be necessary on a regular basis due to the unique needs of an individual student with a disability, IEP recommendations should reflect this.**"*

Emphasis added.

89.     There is nothing in the record demonstrating that any attempt was made to comply with Defendant's own policy. There is no record of instruction provided while C.T. was out of class, and his IEP recommendations do not reflect that he required "instruction outside of the classroom on a regular basis."

90.     In fact, no attempt was made to offer C.T. the protective benefits of either of these District-wide policies, which upon information and belief were both generally available to his school peers.

91.     C.T.'s parents, his psychologist, his psychiatrist, and his private tutor all told the school district repeatedly throughout his seventh grade year, in the strongest possible language, that C.T. urgently required a small, therapeutic school placement.

92.     In February 2012, in the middle of seventh grade, his psychiatrist told the CSE that C.T.:

> *"[R]equires more structure, support and daily intervention than is available currently at*

*Bell"*, such as a ***"structured, therapeutic educational environment to more significantly address his severe, emotional/mental health needs."***

Emphasis added.

93.     In February 2012, his psychologist Dr. Flaum told the CSE:

*"Unfortunately, despite a tremendous degree of support at school, C.T.'s behavior is not improving. More disturbing, he has, at times, been considered a danger to himself and others…. **It is time to act on my recommendation for a more therapeutic placement…** It is my opinion that C.T. is no longer able to benefit from his mainstream educational setting and requires a therapeutic placement with a smaller, more structured milieu."*

Emphasis added. Dr. Flaum also attended the May and June 2012 CSE meetings, and made the same recommendation with increasing urgency.

94.     His private tutor also attended the May 2012 annual CSE review meeting and told the Defendant's CSE team, to no avail, that:

*He was **scary**. I was nervous around him…**he could snap**. What is he going to say? What is one kid going to do to him that would push him over the edge? … I was worried he'd come in and **blow up the whole school**. I was worried there was going to be a whole Columbine thing.*

Emphasis added.

95.     Contending that C.T. was perfectly capable of functioning in large regular education classes with some special education supports, the Defendant ignored all of these recommendations and the pleas of his parents for a smaller, more therapeutic placement at the 2011-2012 IEP program review meeting in February 2012.

96.     Defendant also refused to consider a smaller, therapeutic placement at each subsequent meeting held that year, culminating in the August 2012 annual review meeting that resulted in the 2012-2013 IEP.

97.     While insisting that he remain in a mainstream setting, the District never developed any meaningful or effective behavioral interventions at any time, either in his IEPs or through the

development of a standards-based Functional Behavioral Assessment ("FBA") or Behavior Intervention Plan.

98.     The District's entire IEP response to C.T.'s severe behavioral deterioration during 2011-2012 consisted of two thirty-minute group counseling sessions per month and two inadequate documents: an "FBA: Worksheet" and a "Positive Behavioral Support Plan: Worksheet".

99.     The Defendant's FBA and behavior plan worksheets are brief, one-page documents that neither identify C.T.'s most interfering behaviors nor record any baseline or other data that would permit assessment of the effectiveness of any behavioral interventions that might have been undertaken.

100.     By the time the final CSE meeting was held, in August 2012, the Defendant was aware of all of the markers of C.T.'s academic and behavioral decline, and that there was no data to support that any of their actions had improved C.T.'s functioning.

101.     The parents told the CSE at the August 2012 meeting that C.T. had just been expelled from his day camp weeks before for behaving aggressively with a counselor and for punching a camper in the stomach.

***The IEP Recommended to C.T. for Eighth Grade Replicated Seventh Grade's Failed IEP***

102.     Remarkably, the 2012-2013 IEP the Defendant recommended for C.T. for eighth grade again required C.T. to be attend a large, mainstream class placement with limited supports of Consultant Teacher Services just three times each six-day cycle in his academic core classes. The sole small special education class he was recommended to take was a 12:1 Skills Seminar four days out of each six-day cycle, for 55 minutes per class.

103.     The only behavioral and emotional support he was offered was small group counseling and individual counseling, each for only 25 minutes weekly.

104.    C.T. was, once again, assigned a teaching assistant/aide to follow him full time, including during his lunch and recess.

105.    A Behavioral Intervention Consultation for Teachers was proposed to take place at a future date. No data was collected or reviewed regarding behavior, and no FBA or BIP was developed to support his transition to the mainstream eighth grade program.

106.    Unwilling to subject their son to further deterioration, C.T.'s parents unilaterally placed him at Westfield Day School, a therapeutic day school in nearby Rye, New York which had been recommended by his independent psychologist.

107.    At Westfield, C.T. was frequently instructed in a one-to-one setting, and his largest class had only seven students. He frequently received additional one-to-one support of a special education teacher, who pushed into to his small class academic instruction.

108.    Many things improved for him during the year at Westfield. His school work was not modified, in contrast to that at Bell. He daily took the bus 25 minutes to and from school each day, when by contrast he was barred from the short bus ride to and from the District's school.

109.    Over the next ten months, the police were never called to the house. He was not hospitalized at all that year, as compared with the two hospitalizations he had during the last year at Defendant's school.

110.    C.T.'s Full Scale IQ rebounded to 112 from a low of 82 (in December 2010) after his year at Westfield.

111.    Even C.T.'s incontinence, a debilitating problem throughout middle school, tapered off once he was at Westfield. C.T. enjoyed the other kids, and made a friend. He was invited to his first social event – a Bar Mitzvah. He ate in the lunch room with other students, in contrast to his total isolation in seventh grade.

112.     He told both his parents and Dr. Flaum that he was happier, that the school taught *"at his level".* He attended most days and missed very few classes, in contrast to the almost 200 class absences in Chappaqua the prior year.

113.     C.T. passed all his classes at Westfield and his grades were good.

114.     The following school year, immediately following the events complained of herein, the District finally acknowledged the student's needs and placed C.T. in a therapeutic placement.

115.     Yet the Defendant remained unwilling to reimburse the parents for the crippling expenses they had incurred by supplementing C.T.'s deficient 2011-2012 program, or for their cost of unilateral placement of C.T. at Westfield for the 2012-2013 school year.

116.     Plaintiffs filed a Due Process Complaint ("DPC") on May 28, 2014 seeking reimbursement for compensatory education for claims that Defendant failed to provide FAPE or implement the 2011-2012 IEP, and tuition reimbursement for its failure to provide FAPE in the IEP recommended for the 2012-2013 school year. In addition, they sought declarations that the District's IEPs violated the Section 504 guarantees of FAPE, and that the District's actions constituted discrimination against C.T. under Section 504 and Title II of the ADA.

117.     On June 10, 2014, Plaintiffs made an educational records request. The DPC was amended on August 4, 2014 to address the newly disclosed information contained in the 844 pages of documents produced by Defendant in response to the records request.

118.     The Amended Complaint interposed additional claims regarding the Defendant's predetermination of C.T.'s 2012-2013 IEP, its failure to provide information to the parents that would have permitted them to engage as meaningful participants in the CSE process, and claims challenging the adequacy of the purported functional behavior assessment and behavior intervention plan developed by the Defendant.

119.     After referring the Section 504 and ADA claims to the District's Assistant Superintendent for adjudication, certified Impartial Hearing Officer Theresa Joyner ("IHO") conducted an extensive and thorough hearing. The hearing extended over seven full days, commencing on October 16, 2014 and concluding on June 17, 2015. It encompassed testimony from 12 witnesses, and 104 documents were admitted into evidence.

120.     IHO Joyner issued a 75 page "Findings of Fact and Decision", dated November 4, 2015, ruling for the Plaintiffs on all claims.

### The IHO's Determination Was Well Founded

121.     IHO Joyner determined that the Defendant had improperly withheld material information from the parents regarding the extent and nature of C.T.'s dysfunction during 2011-2012; that because this material was withheld, the statute of limitations concerning the 2011-2012 school year was tolled; that Defendant failed to offer C.T. a FAPE for the 2011-2012 and 2012-2013 school years and summer of 2012; that Plaintiffs were entitled to an award of compensatory education in the form of reimbursement for psychiatric treatment, psychotherapy and tutoring for services provided to C.T. during 2011-2012 and summer 2012, and that they were also entitled to an award of reimbursement of the full amount of the student's tuition at the private Westfield Day School for the 2012-2013 school year as Westfield appropriately addressed C.T.'s needs, and the equities weighed in their favor.

122.     The IHO held that the District: *"did not give appropriate consideration to what C's clinicians, parents and tutor reported to them about C's deteriorating and sometimes dangerous behaviors"*; that *"[d]espite C's deteriorating behaviors, [the school psychologist] did not recommend at any time that the District's psychiatrist evaluate him, nor did she recommend that*

*the District's behavioral consultant be brought in….";* that *"[t]here were no goals or behavioral*

*plan to address the eating issue"* and *"that his challenges and needs dictated that he should be in*

*a 12 month program"* but none was offered.

123.    The IHO made the following additional core fact findings:

- That *[i]t appears that the student's academic, emotional and social skills were rapidly declining".*

- That *"[t]he records clearly establishes that C was a student suffering from a serious mental illness and his overall performance academically, emotionally and socially continued to decline during seventh grade. He struggled to manage the pressures of being in a fast paced, mainstream class with 24-26 students."*

- That the record clearly establishes that the parents were not notified that C.T. had "*missed all or part of 197 classes, rarely ate in the cafeteria with his peers, wandered the halls, and how he was viewed by teachers, staff and aides as addressed in their email exchanges."*

- That the parents were also not provided with his IEP progress report on goals, the nurse's log, school notes and the FBA data collection and work sheets.

- That "*the District withheld material information.*"

- That the Plaintiffs' witnesses were more credible than the Defendant's witnesses.

- That "*Defendants failed to develop a proper FBA and BIP under these specific circumstances."*

124.    As a consequence of her detailed factual determinations, the IHO made the

following core legal rulings:

- That by offering essentially the same inadequate educational program that had so drastically failed C.T. during seventh grade (2011-2012), the District had failed to formulate an IEP for 2012-2013 that was reasonably calculated to enable C.T. to receive educational benefit.

- That the statute of limitations governing the parents' claim regarding the 2011-2012 school year was tolled because *"the basis of their claim did not begin to accrue until 2014 when [the mother] became aware that the District withheld information pertaining to C's education."*

- That the failure to share these documents with the parents "*coupled with the failure to create a proper FBA and BIP under these specific circumstances cumulatively continued a denial of FAPE."*

- That an award of compensatory education was proper to remedy the deficiencies of the student's 2011-2012 IEP and absence of summer 2012 extended school year ("ESY") services.

- That the minimal additions of parent training and a behavioral consultant to a mainstream IEP program for 2012-2013 were insufficient to ensure that the IEP was adequate to the student's FAPE needs for 2012-2013.

- That Westfield was an appropriate placement.

- That the equities favored the parents.

- That the Plaintiffs were therefore entitled to an award of tuition reimbursement for the 2012-2013 school year at Westfield.

## THE SRO'S DECISION

125. The Defendant District appealed the adverse IHO decision to the NYSED State Review Officer, Justyn P. Bates (the "SRO"). The appeal to the SRO was made on submission of a maximum of 20 pages only. No additional documentary evidence was submitted.

126. The SRO issued a final administrative determination on January 7, 2016 reversing the IHO's decision in its entirety, and finding that the District's 2011-2012 and 2012-2013 IEPs provided C.T. FAPE. The SRO did not address the jurisdictional questions presented by the Section 504 or ADA claims, and did not address the IHO's findings that Westfield was an appropriate school for C.T. or that the equities favor the parents. Decision of the SRO in Application of the Board of Education of the Chappaqua Central School District, No. 15-114.

127. The SRO's ruling was premised on a narrow and constrained view of the hearing record that failed to address or even acknowledge the most significant evidence in the record regarding the student's functioning and the District's nonfeasance during 2011-2012.

128. Because of the SRO's erroneous ruling against Plaintiff on Prong I, he did not reach or determine the elements of Prong II or III.

129. Despite the voluminous pleadings submitted by both parties on appeal, the SRO improperly reversed without analysis of the IHO's findings regarding the procedural errors

committed by the CSE in developing the IEP, including claims challenging the sufficiency of the evaluative material relied upon by the CSE and the CSE's failure to afford a full and meaningful opportunity to the parents, C.T.'s clinicians, tutor, or Westfield staff to participate in the meeting and in the development of C.T.'s IEP, as well as substantive claims regarding the adequacy of the IEP's description of C.T.'s needs and the appropriateness of the IEP goals and short term objectives.

130.    In ruling that the statute of limitations regarding the 2011-2012 school year should not be tolled, the SRO failed to weigh or even address uncontested evidence in the record, and the IHO's well-founded determination, that critical material evidence the parents were entitled to and needed to know was withheld from them, and that the level, scope and nature of C.T.'s daily dysfunction was specifically and repeatedly misrepresented to them and to his clinicians.

131.    In ruling that C.T.'s IEP for 2011-2012 was implemented, the SRO simply ignored evidence in the record that in direct violation of his IEP:

- Defendant failed to show that any effective behavioral plan was developed or implemented;

- C.T. wandered the hallways, missing at least 197 classes during seventh grade;

- When he was not in class, he was not being taught;

- He was banned from the school bus, and no attempt was made to ameliorate this.

- No quarterly progress report on IEP goals was issued after January 2012, although two more such reports were required to be produced that school year.

132.    The SRO failed to weigh or even acknowledge the significant restrictions on parent participation in the IEP process that resulted from Defendant's withholding of material information regarding the true nature of the student's day to day functioning.

133.    The SRO summarily credited the testimony of Defendant's witnesses to support

her conclusions, without due consideration of the testimony of Plaintiffs' witnesses, and without detailing the basis for his disregard for the contrary testimony of those witnesses.

134. The SRO ignored the IHO's credibility determination that C.T.'s psychologist was more credible and had more basis for her opinion that C.T. required a therapeutic placement than did the Defendant's school psychologist that he did not.

135. The SRO improperly failed to consider the testimony of C.T.'s psychologist, or of his tutor Kate Pearce, nor to explain why he chose to disregard their testimony.

136. The SRO failed to address or even acknowledge the extent to which the Defendant's uncontested actions towards C.T. directly violated its own Board of Education policies regarding instruction outside of the classroom, and regarding excessive student absences.

137. The SRO erroneously ruled that the Defendant's scanty and inadequate FBA: Worksheet and behavioral plan worksheet were sufficient and effective.

138. The SRO failed to assess these deficient behavior plans against the explicit criteria established in federal and state law and NYSED policy, all of which require that behavioral assessments and plans utilize many sources of information, that they be developed through the collection and analysis of detailed data regarding the behaviors over time, and ongoing, dynamic assessment of whether actions take to address the behaviors are effective. N.Y. Comp. Codes R. & Regs. tit. 8 §§ 200.4(b)(1)(v); 200.1(r).

139. The SRO failed to weigh or even acknowledge that the Defendant's behavior "worksheets" also failed to conform with policy standards established by the Defendant's own Board of Education, which require that:

> *"The implementation of a student's BIP shall include regular progress monitoring of the frequency, duration and intensity of behavioral interventions at scheduled intervals, as specified by the BIP and IEP."*

140.     The record evidence is clear that the Defendant's behavioral documents were scanty, ineffectual and failed to comport with the statutory and regulatory requirements for such plans, or the policy standards developed by Defendant's Board of Education for such plans.

141.     The record is devoid of any documentation that these flimsy behavioral documents served to reduce the significant interfering behaviors C.T. displayed at the public school until his parents removed him.

142.     The SRO ignored the numerous witnesses, including Defendant's own school psychologist and Defendant's own behavioral expert Christopher McDonough Ph.D., BCBA, who testified to their serious concerns regarding the sufficiency of these documents.

143.     The District's own behavioral expert, Dr. McDonough, who has *"worked over 22 years in the field of behavioral analysis"* testified that the District's plans did not meet his profession's standards for an FBA because both FBAs and behavior plans *"absolutely"* require data and measurement.

144.     The SRO misidentified Christopher McDonough, Ph.D., BCBA, and the Defendant's behavioral expert, as the Plaintiff's witness.

145.     In sharp contrast to the SRO's mischaracterization, the IHO found that Dr. McDonough testified that the *"documents did not meet his professional standards"*, and that rather than being a real plan, *"the documents may be a quick summary or a sort of a cheat sheet to help"* someone quickly familiarize themselves with the student.

146.     The SRO failed to address the deficiencies of the behavioral intervention plan or *"ensure that the IEP adequately addresses the child's problem behaviors,"* rendering the contested IEP legally inadequate.

147.     Against the weight of evidence, the SRO held that C.T.'s interfering behavior at

school was "not such that the student's teachers were unable to manage it" fully ignoring the startling scope, range and intensity of his behaviors and the extent to which these were intentionally concealed from his parents.

148. The SRO failed to credit or even mention the horrifying running commentary reported by C.T.'s aide and C.T.'s English teacher during 2011-2012 that described C.T. as unable to work, wandering the halls at will, and as an ostracized outcast who frightened other students and the teacher herself.

149. The SRO failed to weigh the factual record demonstrating that the Defendant did not provide FBA or behavior plans for 2011-2012 or 2012-2013, a clear deprivation of FAPE.

150. The SRO ignored extensive record evidence that neither the 2011-2012 nor the 2012-2013 IEPs offering a mainstream placement in classes of 22-27 students, with limited supports, were wholly insufficient to provide him with FAPE.

151. The SRO failed to weigh or even acknowledge the 844 pages of documents disclosed only after the hearing complaint was filed, which contained information that had been withheld from the Parents about C.T.'s distracted, unengaged, bizarre and aggressive behavior, the extent to which his teachers, aide, guidance counselor and other staff were concerned about him, and that nothing was done to address the specific concerns that arose during the school year.

152. The record overwhelmingly supports the IHO's ruling that the student could not function in a regular education environment, that he required an FBA and a BIP, that he was entitled to ESY, and that the CSE failed to consider material and important documents when developing the IEP for eighth grade.

153. The 2012-2013 IEP that was produced would have provided C.T. with no meaningful educational benefit.

*The IHO's Conclusion that C.T. Required a 12 Month Program is Supported by the Record*

154.    The IHO correctly determined that *"[t]he student's various challenges and needs dictated that he should be in a 12-month program"*, and that *"[t]he District was not responsive to C's overwhelming need for summer services"*.  As a result, she held that the parents were entitled to reimbursement for the funds they expended for related services during summer 2012.

155.    The SRO was incorrect in ruling that the CSE had no evidence that C.T. displayed substantial regression that would have triggered the entitlement to 12 month services.

156.    The SRO failed to consider significant and probative evidence of the student's decline over the 2011-2012 school year, including his repeated hospitalizations, the repeated visits of the police to C.T.'s home, his inability to remain in class, his inability to attend a single PE class during the first quarter, his decline in cognitive functioning through a plummeting Full Scale IQ, his sharply deteriorating New York State Assessment Scores and the numerous internal reports from teachers and guidance that C.T.'s functioning was gravely impaired, or that during the summer of 2012 C.T. was expelled from the day camp, in the words of the IHO, "because of his aggressive and inappropriate behavior" which included being aggressive with a counselor and punching a camper in the stomach, or that he was incontinent, and forced to wear adult diapers at night.

157.    The hearing record reflects that C.T. regressed in every meaningful respect each summer. Without detailing any basis for doing so, the SRO credited a single witness who testified that C.T.'s eligibility for ESY summer services was discussed, over the testimony of every other witness, including other witnesses for the Defendant, who testified that C.T.'s eligibility for ESY was never even discussed at the student's CSE meetings.

158.    Because C.T. regressed each summer, and because the record is devoid of any

evidence that summer services were ever discussed at any of C.T.'s CSE meetings, the 2011-2012 and 2012-2013 IEPs are substantively deficient.

159.    The Plaintiffs sought compensatory relief for Defendant's failure to provide C.T. with a meaningful education during 2011-2012, his last year in the district.

***Compensatory Relief was Appropriate in These Specific Circumstances***

160.    The SRO overturned the IHO's award of compensatory education consisting of reimbursement for tutoring and related services fees the parents expended during the 2011-2012 school year and summer 2012.

161.    In making that award, the IHO had properly exercised her equitable authority to redress the District's failures to properly educate and support the student.

162.    The SRO's ruling is erroneous and should be reversed.

163.    The IHO was authorized to grant such broad relief as she determined appropriate. 20 U.S.C. §1415(i)(2)(C)(iii). The record is clear that C.T. did not receive instruction during 2011-2012, and was barred from access to the regular programs of the school.

164.    C.T. was regularly out of instructional settings –for at least the documented number of 197 hours -- with no apparent plan for how these many hours should be spent.

165.    He was barred from the school bus, barred from taking Spanish, and rarely ate or engaged with peers.

166.    Significant information regarding C.T.'s limitations during 2011-2012 was routinely concealed from his parents.

167.    Compensatory education is an appropriate award available to compensate for the special education services the school district should have supplied in the first place, and which the failure of the Defendant to provide denied C.T. the educational benefit he was due.

***Credibility Determinations Were Ignored by SRO***

168.    The IHO's personal *"assessment of credibility"* and the resulting factual determinations represent the heart of the hearing process, and are due substantial deference.

169.    The IHO particularly noted the credibility of C.T.'s psychologist and evaluator Dr. Flaum, who was also a CSE member during the February 2012, May 2012 and June 2012 CSE meetings.

170.    The IHO found that Dr. Flaum's *"testimony was very credible and persuasive; she had worked closely with the student and his parents for several years"*.

171.    The IHO found that *"the District ... did not give appropriate consideration to what C's clinicians, parents and tutors reported to them about C's deteriorating and sometimes dangerous behavior."*

172.    After hearing testimony from both Dr. Flaum and Dr. Giannettino, the IHO took issue with the Defendant's choice to instead to rely on Dr. Giannettino, the school psychologist, who *"had minimal direct contact with [C.T.]"* and never called in either the District's psychiatrist or behavioral consultant despite their availability.

***SRO's Ruling that the 2012-2013 IEP was Appropriate***
***Was Erroneous and Not Premised in the Record Evidence***

173.    The failure to implement C.T.'s 2011-2012 IEP or to share and consider the most basic elements of C.T.'s levels or performance irrevocably corrupted the process by which the 2012-2013 IEP was developed.

174.    The SRO ignored the Defendant's numerous procedural errors in developing the 2012-2013 IEP, which together were significant enough to render it a substantively insufficient IEP.

175.    The CSE's failure to fully evaluate C.T., to consider sufficient, current, appropriate evaluative and documentary material, to provide all meeting participants with a full and meaningful opportunity to participate in the meeting, and to adequately consult the parent and the individuals most familiar with C.T.'s needs regarding the development of the IEP, resulted in an IEP that failed to appropriately reflect or address C.T.'s needs for the 2012-2013 school year resulting in a denial of FAPE.

176.    Defendant failed to prove that the offered class would have provided C.T. with appropriate instruction or with an adequate level of individual attention and support. No testimony was provided regarding how this differentiation would have been effectuated or regarding how C.T.'s particular needs would be addressed in the classroom, given the high level of individual attention and support C.T. requires to learn new concepts, stay on task, and even to stay in the classroom.

177.    Given the information withheld and then provided belatedly to C.T.'s parents regarding the behavioral issues exhibited by C.T. at the school, Defendant failed to show that C.T. would have received the level of individual attention and support from a teacher that he needs to make appropriate progress.

178.    Defendant also failed to show that the offered placement would have appropriately addressed C.T.'s non-compliance issues in the classroom since no testimony was presented regarding how this need would have been addressed, and the behavioral intervention methods purportedly utilized during 2011-2012 led to a series of academic and social declines, reduced attendance and missed classroom instruction.

179.    Defendant was unable to meet its burden of proof to show that either the 2011-2012 or 2012-2013 IEPs met C.T.'s needs and were reasonably calculated to provide

meaningful educational benefit.

180.    Since the evaluative material the CSE team had available to it for review is inaccurate, incomplete or outdated, the CSE was unable to develop an appropriate IEPs built upon an accurate statement of C.T.'s then "present levels of performance".

181.    Defendant did not meet its burden to provide C.T. with IEPs for 2011-2012 or 2012-2013 which articulated a detailed, goal-oriented roadmap to his likely progress over the forthcoming school year. 20 U.S.C. § 1414(d)(1)(A).

182.    C.T.'s IEPs for 2011-2012 and 2012-2013 were not developed through the required collaborative process between the school district and the parents. §1414(d)(1)(B).

183.    Defendant was unable to meet its burden to establish that it could have appropriately implemented C.T.'s IEP as of the first day of the 2012-2013 school year.

184.    Defendant's actions deprived C.T., without limitation, of his rights under the law.

**The IHO's Determination that Westfield was Appropriate**
**for C.T. is Well Founded and Entitled to Deference**

185.    Although the SRO never reached the issue of whether the private educational placement selected by the parents was appropriate for C.T., or whether equitable factors would have prevented the parents from being reimbursed for some or all of their expenses, both elements should be decided in the parents' favor.

186.    The hearing record demonstrates that Plaintiffs adequately met their burden of proving that Westfield appropriately addressed C.T.'s unique needs and enabled him to make measurable progress and to avoid regression during the 2012-2013 school year.

187.    The SRO should have reached Prong II and determined it in Plaintiffs' favor.

188.    The IHO, after hearing all the witnesses and reviewing the record at bar, found that

*"the record supports the parents' selection of Westfield as an appropriate placement for their son."*

189.    The witnesses who testified also supported the appropriateness of Westfield for C.T.

190.    The IHO held that Westfield:

*"[P]rovided an academic challenge for the student and a therapeutic setting to handle his emotional needs. The student's program was finely tuned and tailored to meet his unique special education needs. The school honed in on academic deficits by providing intense reading and writing one on one sessions. He was provided with ample emotional support ... [t]he parents have met their burden."*

191.    After hearing all the witnesses and making credibility determinations regarding their testimony, the IHO found that C.T. *"made progress emotionally, socially and academically during his school year at Westfield."*

192.    Like the rest of this thorough, well-reasoned opinion, this finding is based upon an exacting examination of the record and should not be disturbed.

### A Weighing of Equitable Considerations Supports an Award of Reimbursement of the Cost of C.T.'s Westfield Tuition for the 2012-2013 School Year

193.    The record shows that Plaintiffs K.C. and M.T. fully cooperated with the CSE in this case, attended five CSE meetings, and were willing to consider any appropriate public placement for C.T. for the 2011-2012 and 2012-2013 school years.

194.    Plaintiff K.C. testified that she and her husband had no objection to C.T. attending a public school program, and that she and her husband would have accepted an appropriate public placement had one been offered.

195.    They proved this by subsequently accepting the much-delayed offer by the Defendant of a public therapeutic BOCES placement for the 2013-2014 school year.

196.    Since it was only due to Defendant's failure to provide Plaintiff C.T. with an offer of FAPE that Plaintiffs K.C. and M.T. were forced to unilaterally place C.T. at Westfield for the 2012-2013 school year and to incur the costs associated with that program, Defendant should be belatedly required to pay the expenses it forced Plaintiffs to incur.

197.    The record thus shows that equitable considerations should weigh in favor of Plaintiffs' claim for reimbursement for C.T.'s tuition.

## FIRST CAUSE OF ACTION: THE IDEA

198.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

199.    Defendant's failure to offer Plaintiff C.T. a free and appropriate public educational for the 2011-2012 and 2012-2013 school years deprived Plaintiff C.T. of a FAPE pursuant to the IDEA, 20 U.S.C. § 1415 *et. seq.*, and the regulations promulgated thereunder.

## SECOND CAUSE OF ACTION: NEW YORK EDUCATION LAW

200.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

201.    Defendant's failure to offer Plaintiff C.T. a free and appropriate public educational for the 2011-2012 and 2012-2013 school years deprived Plaintiff C.T. of a FAPE pursuant to Article 89 of the New York Education Law, specifically Educ. Law §§ 4401, 4404, & 4410, and the regulations promulgated thereunder.

## THIRD CAUSE OF ACTION: FAPE PURSUANT TO SECTION 504

202.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

203.    C.T. is a qualified individual with a disability under Section 504 of the

Rehabilitation Act, U.S.C. § 794.

204.     The Defendant was required to provide C.T. with a free and appropriate public education ("FAPE") in compliance with Section 504, which mandates that C.T. receive regular and special education and related aids and services designed to meet his individual educational needs as a disabled person as adequately as the needs of his nondisabled fellow students were met.

205.     Defendant failed to provide Plaintiff C.T. with a FAPE meeting the procedural and substantive requirements of Section 504 for the 2011-2012 and 2012-1013 school years including summer 2012.

**FOURTH CAUSE OF ACTION: SECTION 504 DISCRIMINATION**

206.     Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

207.     In violation of Section 504, Defendant excluded C.T., an otherwise qualified student with a disability from participation in programs and activities receiving federal financial assistance.

208.     Defendant failed to offer him the benefit of District-wide policies applicable to every other student that were designed to address excessive absences; failed to provide C.T. with the benefit of a District-wide policy that requires that all students are instructed even when they are unable to remain in the classroom; and barred him from the school bus solely due to his inability to control manifestations of his disability. 29 U.S.C. § 794.

209.     Defendant's conduct towards C.T. was knowing, intentional and reckless.

210.     Such exclusion, denial and/or discrimination were by reason of C.T.'s disability and were in violation of Section 504.

## FIFTH CAUSE OF ACTION: VIOLATION OF TITLE II OF THE ADA

211.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

212.    C.T. is a qualified individual with a disability under Title II of the ADA, 42 U.S.C. § 12132.

213.    Title II of the ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." *Id.*

214.    By the acts and omissions of the District and its employees, the District excluded C.T., from participation in, and/or denied him the benefits of the services, programs and activities of the District by ignoring his excessive absences, failing to instruct him when he could not remain in class, and by barring him from the school bus due to manifestations of his disability.

215.    Such exclusions and denials of benefits, programs and activities were by reason of his disability and in violation of Title II of the ADA.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs request that the Court:

a.    Find that the IDEA's two-year statute of limitations should be tolled regarding Plaintiffs claims that FAPE under the IDEA was not provided during 2011-2012;

b.    Reverse the SRO's finding that the student was provided with a FAPE under the IDEA and the New York Education Law for the 2011-2012 and 2012-2013 school years;

c.    Award Plaintiffs compensatory education of reimbursement for therapy and

tutoring as equitable relief for the Defendant's failure to provide FAPE under the IDEA during 2011-2012 and summer 2012;

d.        Find that the Westfield Day School provided C.T. with an appropriate placement during the 2012-2013 school year;

e.        Find that equitable considerations do not preclude reimbursement for tuition;

f.        Award Plaintiffs 100% tuition reimbursement for the 2012-2013 school year;

g.        Issue a Declaratory Judgment on behalf of the Plaintiffs that Defendant's failure to provide C.T. with a FAPE violated Plaintiffs' rights under the Section 504 of the Rehabilitation Act of 1973;

h.        Issue a Declaratory Judgment that Defendant's actions discriminated against C.T. in violation of his rights under Section 504 of the Rehabilitation Act;

i.        Issue a Declaratory Judgment that Defendant's actions discriminated against C.T. in violation of his rights under Title II of the Americans with Disabilities Act;

j.        Award Plaintiffs their costs and attorneys' fees;

k.        Grant such further relief as this Court deems just, proper and equitable.

Dated:  April 27, 2016
          Armonk, New York

Respectfully Submitted,

s/ RACHEL ASHER
RACHEL ASHER (RA 2610)
Asher, Gaughran LLP
4 MacDonald Avenue
Armonk, New York 10504
Telephone: (914) 273-3187
Facsimile: (914) 273-3206

asher@ashergaughran.com

*Counsel for Plaintiffs*