UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

K.C., individually and on behalf of J.C.T.,
M.T., individually and on behalf of J.C.T., and
J.C.T., on behalf of himself,

                               Plaintiffs,

      -v-

CHAPPAQUA CENTRAL SCHOOL
DISTRICT,

                            Defendant.

Case No. 16-CV-3138 (KMK)

OPINION & ORDER

Appearances:

Rachel S. Asher, Esq.
Asher Gaughran, LLP
Armonk, NY
*Counsel for Plaintiffs*

Mark C. Rushfield, Esq.
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Plaintiffs K.C. and M.T. ("Plaintiff Parents"), and their son J.C.T. ("C.T.") (collectively "Plaintiffs"), bring this Action alleging that Defendant Chappaqua Central School District ("Defendant" or the "District") denied C.T. a free and appropriate public education ("FAPE") for the 2011–2012 and 2012–2013 school years, in violation of the Individuals With Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1415 *et seq*., New York Education Law, N.Y. Educ. Law §§ 4401, 4404, 4410, and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794 et seq., and discriminated against C.T. in violation of Section 504 and Title II of the

Americans With Disabilities Act (the "ADA"), 42 U.S.C. § 12132. (*See* Am. Compl. (Dkt. No. 52).)  Defendant now moves for partial summary judgment based upon the statutes of limitations. (Not. of Mot. (Dkt. No. 54).)  For the reasons stated below, Defendant's Motion for Partial Summary Judgment is denied.

## I.  Background

### A.  Factual Background

The following facts are taken from Defendant's statement pursuant to Local Civil Rule 56.1 (Def.'s Rule 56.1 Statement ("Def.'s. 56.1") (Dkt. No. 59)), Plaintiffs' response to that statement, (Pls.' Resp. to Def.'s 56.1 Statement ("Pls.' 56.1 Resp.") (Dkt. No. 63)), Plaintiffs' statement of additional material facts and counterstatement of facts (Pls.' Rule 56.1 Counterstatement ("Pls.' 56.1 Counter.") (Dkt. No. 64)), Defendant's response and counterstatement of facts (Def.'s Rule 56.1 Counterstatement ("Def.'s 56.1 Counter.") (Dkt. No. 83)), and the admissible evidence submitted by the Parties, and are recounted in the light most favorable to Plaintiff, the non-movant.  The facts as described below are not in dispute, except to the extent indicated.[1]

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule."  *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same).
Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, the Court will not consider them as creating disputes of fact.  *See Baity*, 51 F. Supp. 3d at 418 ("Many of [the] [p]laintiff's purported denials—and a number of his admissions—improperly interject arguments and/or immaterial

Plaintiff C.T. was classified by the District as a disabled student with emotional disturbance. (Rachel Asher Decl., Esq. ("Asher Decl.") Ex. 74, at 5 (Independent Hearing Officer ("IHO") Decision ("IHO Decision")) (Dkt. No. 77).) C.T. attended the District's schools from kindergarten through 7th grade. (*Id*. at 44–46.) C.T.'s social issues, avoidance of fine motor activities, and distractibility were documented concerns since preschool. (*Id*. at 44.) C.T. was diagnosed with ADHD in the third grade and with early onset bipolar disorder at the beginning of sixth grade. (*Id*. at 19, 30, 44–45.)

C.T. attended the District's Bell Middle School under an Individualized Education Plan ("IEP") during the 2011–12 school year. (Def.'s 56.1 ¶ 4.)[2] C.T. started the 2011–12 school

facts in response to facts asserted by [the] [d]efendants, often speaking past [the] [d]efendants' asserted facts without specifically controverting those same facts."); *id.* ("[A] number of [the] [p]laintiffs' purported denials quibble with [the] [d]efendants' phraseology, but do not address the factual substance asserted by [the] [d]efendants."); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining that the plaintiff's 56.1 statement violated the rule because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant, without specifically controverting those facts," and "[i]n other instances, . . . neither admits nor denies a particular fact, but instead responds with equivocal statements"); *Goldstick v. The Hartford, Inc.*, No. 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (noting that the plaintiff's 56.1 statement "does not comply with the rule" because "it adds argumentative and often lengthy narrative in almost every case[,] the object of which is to 'spin' the impact of the admissions [the] plaintiff has been compelled to make").

In some instances, the Parties identify actual disputes of fact but fail to cite the supporting portions of the record; this also could permit the Court to deem the challenged facts undisputed. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (explaining that the court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the court's attention); *Baity*, 51 F. Supp. 3d at 418 (collecting cases holding that "responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact." (alteration and internal quotation marks omitted)).

[2] Plaintiffs object to Defendant citing to the State Review Officer ("SRO") decision in support of its statement of facts on the grounds that this Court in its Opinion & Order Denying Defendant's Motion for Judgment on the Pleadings held the SRO's conclusion that Plaintiffs' claims accrued in early 2012 was not dispositive. (June 1, 2017 Opinion & Order (Dkt. No. 40).) In that Order, however, this Court also made clear that it could consider the SRO decision as it is

year pursuant to an IEP developed on March 23, 2011, (Asher Decl. Ex. 1 ("Mar. 23, 2011 IEP"), at 8). His IEP was updated on February 15, 2012 as a result of an annual review. (Asher Decl. Ex. 18 ("Feb. 15, 2012 IEP"), at 8.) Pursuant to both IEPs, C.T. was permitted to take breaks from the classroom for "a brief walk or other type of short break" when he became frustrated or fatigued. (Mar. 23, 2011 IEP at 8; Feb. 15, 2012 IEP at 8.) C.T.'s 2011–12 IEPs also provided that he would be kept in large mainstream classes but would receive additional counseling and assistance from a school guidance counselor. (Mar. 23, 2011 IEP at 5–8; Feb. 15, 2012 IEP at 5–8.) Throughout the 2011–12 school year, Plaintiff Parents asked the District to place C.T. in a small, therapeutic school setting, but the District denied their requests and kept C.T. in a general education setting. (Asher Decl. Ex. 78 ("IHO Tr."), at 42–49, 154–56, 1247.)[3]

---

a part of the record in this case and in any event a public filing of which judicial notice may be taken. (*Id.* at 10–11 (citing *Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 57 (2d Cir. 2003) ("Judicial notice may be taken of public filings . . . .")))); *See also Golden Hill Paugussett Tribe of Indians v. Rell*, 463 F. Supp. 2d 192, 197 (D. Conn. 2006) ("Among the matters of which courts may take judicial notice are decisions of an administrative agency." (internal quotation marks omitted)); *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002) ("[T]he [c]ourt may take judicial notice of the records of state administrative procedures, as these are public records . . . ." (internal quotation marks omitted))). Moreover, this Court did not hold that all facts found by the SRO would be disregarded. In fact, the Court emphasized that as a general rule, some measure of deference is owed to the SRO, especially in matters where the SRO employed educational expertise. (June 1, 2017 Opinion & Order at 17–18.) Inasmuch as Defendant does not cite to the SRO for legal conclusions, but rather for facts, such as the dates during which C.T. attended the District's schools, (*see, e.g.*, Pls.' 56.1 Resp. ¶¶ 4, 12, 22, 23), and Plaintiffs do not dispute those facts, this Court will accept such facts as undisputed.

[3] The Court notes that the Parties submitted portions of the administrative record, such as the Transcript of the IHO Hearing, as numerous separate exhibits, so that for example, Plaintiffs' Exhibit 77 consists of IHO Hearing Transcript pages 150–157 and Defendant's Exhibit Y consists of IHO Hearing Transcript pages 2–153. Where an exhibit consists of portions of the IHO Hearing Transcript, the Court will cite to the relevant page numbers of the transcript only rather than separate exhibits.

Several "Committee on Special Education" ("CSE") meetings were held during the 2011–12 academic year to discuss C.T.'s progress. At each CSE meeting that Plaintiff Parents attended, they were handed a packet of materials. (Def.'s 56.1 ¶ 33.)[4] After each CSE meeting, Plaintiff Parents would take the packet of materials provided to them home. (Def.'s 56.1 ¶ 34.) Plaintiff Parents did not review the documents in the packets of materials provided to them during the CSE meetings during the 2011–12 school year before providing them to their attorney to use as a source of information in Plaintiffs' May 27, 2014 Due Process Complaint Notice. (Def.'s 56.1 ¶¶ 35–36.)

The Parties agree that during the 2011–12 school year C.T. was in the 7th grade and that the "District reported on his bizarre nonverbal gestures, his use of a high-pitched voice, the fact that he banged on desks, fidgeted, and that his behavior interfered with his ability to attend to instruction." (Def.'s 56.1 ¶ 9.)[5] They also agree that during that same year C.T.'s out-of-control behaviors paralyzed his family and police were called to their home on four different occasions during the school year "when he repeatedly became violent and aggressive." (Def.'s 56.1 ¶ 10.) Clint Keegan ("Keegan") was the special education teacher for the 7th grade team at the District's Bell School and C.T.'s consultant teacher during the 2011–12 school year. (Def.'s 56.1 ¶ 30.) Keegan testified before the IHO that he did not recall what C.T. would have been doing at times when he left class during an excused or unexcused absence, but that he knew

---

[4] Where the Court cites to only one of the Parties' Rule 56.1 Statements or Counterstatements, that fact is undisputed.

[5] Prior to the commencement of the 2011–12 school year, M.T. was aware that C.T. had difficulty following instructions, (Def.'s 56.1 ¶ 24), and that C.T. would shut down when overwhelmed, (Def.'s 56.1 ¶ 26). During the 2011–12 school year, M.T. knew that C.T. was not attending all of his classes all of the time. (Def.'s 56.1 ¶ 27.)

"[C.T.] wasn't leaving, for example, an academic class to go somewhere else for instruction."
(IHO Tr. 477.)

C.T. was banned from riding the school bus for parts of the 2011–12 school year, but as of May 2012, he sporadically rode the school bus again.  (Def.'s 56.1 ¶ 91.)

The Parties dispute the contents and timing of most other communications between the District and Plaintiff Parents regarding C.T.'s progress during the 2011–12 school year.

### 1.  CSE Meetings

#### a.  February 10, 2012 CSE Meeting

The Parties dispute what was discussed and which documents were shared at the 2011–12 CSE meetings.  For example, Defendant alleges that the CSE packet provided at the February 15, 2012 CSE meeting, included a "Student Attendance Detail" for C.T. for the 2011–12 school year, generated on January 31, 2012, for the 2nd quarter of the 2011–12 school year.  This document set forth that during that period C.T. was recorded as absent from his classes for a total of 72 class periods, comprised of 35 excused classroom period absences and 37 unexcused classroom period absences.  (Aff. Elizabeth Wright ("Wright Aff.") ¶ 5c (Dkt. No. 57); Wright Aff. Ex. 4 ("Q2 Student Period Attendance Detail").)  The IEP produced following the February 15, 2012 CSE meeting summarizes the meeting but contains no reference to the Attendance Detail or class-by-class attendance having been discussed at the meeting.  (Feb. 15, 2012 IEP at 1–2.)  However, page two of the February 2012 IEP, which Plaintiffs admit to receiving during the 2011–12 school year, lists an "Attendance Report" among the "Evaluations/ Reports" considered in the preparation of that IEP.  (Feb. 15, 2012 IEP at 3.)

Dr. Marta Flaum ("Flaum"), C.T.'s psychologist, attended all the CSE meetings for the 2011–12 school year and she testified that the student's class-by-class attendance was never

discussed at any of those meetings and that she only learned that "[C.T.] missed an extraordinary number of classes" while preparing for the due process hearing. (IHO Tr. 732–33.) C.T.'s tutor, Kate Pearce ("Pearce"), attended C.T.'s June 2012 CSE meeting, and testified that she did not recall any discussion of his attendance at that meeting. (IHO Tr. 879.) Plaintiff M.T. considered C.T. having excused absences from 99 class periods and unexcused absences from 37 class periods through March 2012 of the 2011–12 school year to be egregious. (Def.'s 56.1 ¶ 28.)

The Parties also dispute whether Plaintiff Parents received a Functional Behavior Assessment: Worksheet ("FBA Worksheet") dated February 10, 2012 at the February 15, 2012 CSE meeting. CSE Chairperson Elizabeth Wright ("Wright") alleges that the packet provided to the CSE members, including Plaintiff Parents, at the February 15, 2012 CSE meeting, contained the FBA Worksheet and that this document identified that "behavior[s] of concern that have been occurring" included "[w]ork avoidance" and "[l]eaving the classroom." (Wright Aff. ¶ 5a; Wright Aff. Ex. 2 ("FBA").) Wright also claims that the CSE packet provided at the February 15, 2012 CSE meeting, included a Positive Behavior Support Plan: Worksheet ("PBSP Worksheet") dated February 10, 2012. This document set forth, among other things, interventions and positive supports that would be applied in order to address C.T.'s interfering behaviors, including one addressed to C.T.'s practice of leaving classrooms while they were in session. (Wright Aff. ¶ 5b; Wright Aff. Ex. 3 ("PBSP").) Neither the FBA Worksheet nor the PBSP Worksheet contain data regarding the frequency with which Plaintiff C.T. was unable to remain in the classroom. (FBA; PBSP.) Plaintiffs do not dispute the contents of these sheets, however, K.C. and Flaum both testified that the FBA and PBSP Worksheets were not reviewed at the February 15, 2012 CSE meeting, and that the first time either of them saw these documents was during preparation for the impartial hearing in 2014. (IHO Tr. 712, 1237–40.) Notably, in a

different portion of K.C.'s testimony before the IHO, on redirect, when shown the FBA and

PBSP forms and asked if she had seen them, she said "[y]eah, we did look at this at one of the

CSE meetings. I don't recall which one . . . I guess I wasn't focusing." (IHO Tr. 1377.)[6]

Plaintiffs further offer the fact that the FBA and PBSP Worksheets are each date-stamped

"ORIGINAL RECEIVED MAR 13 2012 CSE/CPSE" as evidence that Plaintiffs did not receive

or review these worksheets during the February 15, 2012 CSE meeting. (Asher Decl. Ex. 26

("FBA"); Asher Decl. Ex. 27 ("PBSP").) Defendant points out that the first page of the February

2012 IEP, which Plaintiffs admit to receiving during the 2011–12 school year, lists the

"Functional Behavioral Assessment (02/15/2012)" as among the "Evaluations/ Reports"

considered in the preparation of that IEP. (Feb. 15, 2012 IEP at 3.)

The Parties agree that the materials provided to Plaintiff Parents at the February 15, 2012

CSE meeting included several "Student Evaluation for the CSE Requested Review" documents

prepared by C.T.'s English, Spanish, and Science teachers and that each indicated that C.T.

would frequently leave class. (Def.'s 56.1 ¶¶ 72–75.) C.T.'s Spanish teacher in particular wrote

that that C.T. was in class only approximately 25% of the time. (Def.'s 56.1 ¶ 73.) However, his

---

[6] Although parties cannot create disputes as to material facts by contradicting themselves, *see Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony."), K.C. expressed that she was not sure whether she had been shown the documents at various CSE meetings or not. "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (same). K.C. did not belatedly submit affidavits that contradicted her prior testimony—she expressed her confusion about which documents she had seen during the same hearing on the same day while her attorney was refreshing her memory. Therefore, the Court resolves any ambiguity as to what K.C. expressed in that portion of her testimony in Plaintiffs' favor and considers K.C.'s allegation that she did not see the FBA and PBSP worksheets until 2014.

science teacher wrote that his attendance had improved and that he was "more engaged in class." (Def.'s 56.1 ¶ 75.)  The February 15, 2012 IEP section summarizing the February 15, 2012 CSE meeting notes that the "special education teacher working with the student reports the student has been on time and consistently attending core classes recently.  He is able to ask to leave the room appropriately when required."  (Feb. 15, 2012 IEP at 2.)  C.T.'s Science teacher participated in the meeting and noted "the student arrives to class ready to participate . . . Second quarter is reported to have been more successful for the youngster than first . . . His most recent algebra test score was 83."  (*Id.*)  The summary, however, also notes that the "student's father expressed a concern that he had the impression his son was missing a lot of class," and that Flaum had stated concerns that "the student is not able to access the curriculum."  (*Id.*)

At the February 15, 2012 CSE meeting, C.T.'s classification was changed from other health impaired to emotionally disturbed based on his "difficulty with emotional regulation and making social connections."  (IHO Decision 10, 12; IHO Tr. 385–88.)  The CSE adjusted the student's program by adding a special skills class in place of C.T.'s Spanish class, increasing counseling services, and adding counseling consultation.  (Feb. 15, 2012 IEP 2.)  The CSE refused Plaintiffs' requests for a therapeutic placement for C.T. at the program review in February 2012.  (IHO Tr. 42–49, 154–56, 1247.)  Wright testified that although Plaintiff Parents warned the District that "there had been some calls to the police department based on some incidents at home with them, as well as his sister," that there was no "physical behavior being seen by the staff at school," (IHO Tr. 47), and that the District decided it "[was] able to meet his needs at . . . [the] Bell School," (IHO Tr. 150).  Wright further testified that the District did not recommend that the District's psychiatrist evaluate Plaintiff C.T., and did not include a behavioral consultant in the CSE reviews, as the CSE team did not think either were warranted

because the District "had what they needed with the supports that we were providing." (IHO Tr. 153–58.)

### b. May 1, 2012 CSE Meeting

At the May 1, 2012 CSE meeting attended by Plaintiff Parents, C.T. was reported to have developed an increased ability to remain in class for longer periods of time. (Def.'s 56.1 ¶ 64.) However, Defendant also claims that the CSE packet provided to Plaintiffs at that May 1, 2012 CSE meeting, included a "Student Attendance Detail" for C.T. for the 2011–12 school year, generated on March 9, 2012, which revealed that C.T. had been absent during 83 classroom periods during the first quarter of that school year, during 36 classroom periods during the second quarter, and 27 classroom periods during the third quarter, for a total of 146 classroom periods missed during the first three quarters of that year. (Wright Aff. ¶ 13; Wright Aff. Ex. 12 ("All Terms Student Period Attendance Detail").) Plaintiffs deny receiving this document at the May 1, 2012 CSE meeting and, as noted, K.C. testified at the impartial hearing that she first saw her son's "class-by-class" Attendance Detail record for 2011–12 in 2014. (IHO Tr. 1151–52.)

### c. June 1, 2012 CSE Meeting

Defendant also claims that the CSE packet provided to Plaintiff Parents at that the June 1, 2012 CSE meeting, included the February 10, 2012 FBA Worksheet and PBSP Worksheet. (Wright Aff. at ¶ 16.) K.C. and Flaum both attended the June 1, 2012 CSE meeting and testified that they first saw the FBA and PBSP Worksheets during preparation for the impartial hearing in 2014. (IHO Tr. 712, 1237–40.)

K.C. testified that at the June 2012 CSE meeting, she and her husband raised issues of physical violence by C.T. that were happening at home with the CSE team because they were "afraid that our child was a danger to not only us but to the school." (IHO Tr. 1245.) K.C.

testified that Pearce was also at the June 2012 CSE meeting and that she told the committee there was a possibility of a "Columbine-like attack" by CT. (IHO Tr. 1246.) At the end of the June 2012 CSE meeting, no changes were made to C.T.'s educational plan. (IHO Tr. 1247.) K.C. testified that the school was nonresponsive when she warned them about C.T.'s violent behavior, and that the school "never wanted to discuss the stuff that was really happening. They'd sit blankly." (IHO Tr. 1175, 1246.)

M.T. testified, with respect to all CSE meetings, that "I can tell you that at each CSE meeting that I attended, we would be handed a packet of materials, and the meeting would start and the packet was so thick, that there was not time or opportunity to go through the documented (sic) in it. So unless it came up in the CSE meeting, I would not have reviewed anything else in that packet." (Aff. of Mark C. Rushfield, Esq. ("Rushfield Aff.") Ex. E ("M.T.'s Dep."), at 70 (Dkt. No. 56).) K.C. testified that "[t]here really wasn't an opportunity" to review the materials in the packets during the CSE meeting. (Rushfield Aff. Ex. D ("K.C.'s Dep."), at 26.)

### 2. C.T.'s Absence from Class

#### a. Access to Report Cards and Parent Portal

Plaintiff Parents allege they were not notified of C.T.'s low class-by-class attendance record during the 2011–12 school year. (IHO Tr. 1151–52.) The District counters that Plaintiffs received, among other documents, "Student Attendance Detail" reports during CSE meetings and that the same attendance information was available online through a parent portal. (Wright Aff. ¶ 5c; Wright Aff. Ex. 4; IHO Tr. 1514, 1516–17, 1523–1535 , 1538–40.)

Plaintiff K.C. saw all of C.T.'s report cards during the 2011–12 school year as they were issued. (Def.'s 56.1 ¶ 65.) However, District report cards only list days a student is absent or tardy but do not report individual class absences. (IHO Tr. 1548; Asher Decl. Ex. 81 ("Q2

Report Card").)  For example, C.T.'s November 2011 First Quarter Report Card stated that the

student had been absent five days and tardy to school on nine days.  (Asher Decl. Ex. 5 ("Q1

Report Card").)  C.T.'s January 2012 Second Quarter Report Card noted that the student had

been absent twice and tardy to school on one day.  (Q2 Report Card.)  However, despite not

missing many entire school days, the District recorded C.T. as having missed 197 classes during

the 2011–12 school year.  (All Terms Student Period Attendance Detail.)  Plaintiff K.C. testified

at the IHO hearing that she first saw her son's "class-by-class" Attendance Detail record for

2011–12 in 2014, after the due process hearing was initiated, and that "it was really shocking.

The amount of absences is unbelievable . . . The amount of class absences totaled almost 200

classes where he didn't attend."  (IHO Tr. 1151–52.)

    Defendant also points to the fact that student attendance on a class-by-class basis was

available on the calendar page of the District's portal website.  Attendance incidents, such as

missing portions of classes or being late to class, were identified on the calendar by a yellow

bell.  (IHO Tr. at 1322–25, 1514, 1516–17, 1523–1535.1538–40.)  Plaintiff Parents logged into

the parent portal 12 times during the 2011–12 school year.  (Rushfield Aff. Ex. C ("SRO

Decision"), at 14; IHO Tr. 1525–35.)  The District's Director of Technology, Darleen Nicolosi

("Nicolosi"), testified that she was unable to confirm that parents were notified of the new

period-by-period Attendance Detail when it was made available on the parent portal starting at

the beginning of the 2011–12 school year.  (IHO Tr. 1546–49.)  Nicolosi testified that the

District sent out several letters each year indicating that the parent portal was available but that

she did not recall if the District specifically mentioned period-by-period attendance in 2011–12.

(*Id*.)  She also testified that she could not confirm whether Plaintiff Parents ever accessed the

Attendance Details while they were logged into the parent portal.  (*Id*. 1537.)  K.C. testified she

logged into the parent portal to check C.T.'s attendance on his report cards and that she had "no idea that there was any more specific attendance information available" on the parent portal. (*Id.* at 1550–53.)

### b. Breaks Taken in the Nurse and Guidance Counselor's Offices

The Parties dispute whether Plaintiff Parents were aware during the 2011–12 school year that C.T. was taking frequent and lengthy breaks in the guidance counselor and nurse's offices, or whether Plaintiffs only learned of those longer breaks in 2014 during discovery in this case. Jason Sclafani ("Sclafani") was a school counselor at the District's Bell school, (Def.'s 56.1 ¶ 38), and Pat Pollock ("Pollock") was the school nurse. (Def.'s 56.1 ¶ 43.)

Plaintiff Parents admit that they were aware of specific instances of their son going to the nurse or guidance counselor's office. For example, on March 28, 2012, C.T. reported to K.C. that on that day he had gone straight to Sclafani's office in the morning and spent periods one through four there because he felt depressed. (Def.'s 56.1 ¶ 40.) That same day K.C. learned that C.T. had gone to his music class in the afternoon, but after 10 minutes he went to Pollock's office because he felt tired and down. (Def.'s 56.1 ¶ 41.) Other teachers had brought C.T.'s visits to the nurse's office to Plaintiffs Parents attention. (Def.'s 56.1 ¶ 45.) For example, on November 3, 2011, Keegan told Plaintiffs that C.T. would "leave classrooms he does not wish to attend and visit [Pollock]." (*Id.*)

During the March 24, 2015 hearing before the IHO, K.C. testified that she knew that C.T. visited Pollock's office "frequently if he was feeling upset or if he needed to get out" and that he ate lunch in her office "from time to time." (IHO Tr. 1218–1220.) K.C. also testified, however, that she did not receive any logs or reports of exactly how often C.T. visited the nurse's office during the 2011–12 school year and only saw documentation of those visits in 2014. (*Id.*) The

Health Office Visit Report for the period from September 8, 2010 through February 7, 2012 lists dozens of visits by C.T. to Pollock's office, but does not specify the duration of each visit. (Asher Decl. Ex. 21 ("Health Office Visit Report").) Plaintiff K.C. testified that she first saw this report in July 2014. (IHO Tr. 1217–20.)

During K.C.'s October 13, 2017 deposition, she clarified that when she testified on March 24, 2015 before the IHO that she was aware that C.T. was "having some difficult times, [and] . . . getting more and more breaks" and that C.T "would go to Jason Sclafani's office for a period or two periods . . . [and was] going to the nurse's office and he was just out of class," (K.C.'s Dep. 8–13), she did not know if she learned of those facts "as [they were] happening or if [she] knew it as a result of the documentation . . . received from the school [during discovery]." (K.C.'s Dep.12.)

### 3. Additional Information Plaintiffs Allege Was Withheld

Plaintiffs also point to numerous internal District communications describing troubling behavior by C.T. that was not shared with them until 2014. For example, in a February 7, 2012 email, Sclafani wrote to Wright and Keegan, among others, that C.T. was having "major issues for about a week now. There is a requested review coming next week and I would like to fill you in beforehand . . ." (Asher Decl. Ex. 9 ("Sclafani Email").) Sclafani testified that he "was hoping to check in with [Wright]" to "get as much information as [he] could from her end" so that he could "advocate for [C.T.]." (IHO Tr. 537–40.) Sclafani testified that he "hadn't had a student like [C.T.]," and that he wanted to "look[] at any possible options for [C.T] in terms of . . . out-of-district placement, if any in-school placements could be looked at." (*Id.*) Plaintiffs allege that the "major concerns" addressed in his communications with Wright were not shared with them. (Pls.' 56.1 Counter. ¶ 17.) However, Plaintiffs fail to cite to admissible evidence in

support of the proposition that this information was not shared with them as required by Local Rule 56.1(d).[7]  Plaintiffs' denial in their unsworn Rule 56.1 Statement does not create a dispute of material fact, as there is, for example, no sworn statements from Plaintiffs denying that they did not receive this information.

Sclafani also testified that C.T. felt "uncomfortable in his own skin," and "perhaps stupid."  (IHO Tr. 563–64.)  He further testified that C.T. used "aggressive language" with him, used "sexually explicit" language with him about students and teachers, and said he "wanted to kill somebody" though Sclafani did not believe that to be a credible threat.  (IHO Tr. 585–88.)  Plaintiffs allege that the "record does not reflect that Sclafani ever informed the [P]arents of his assessment of C.T.'s emotional status" nor of the "aggressive language" C.T. allegedly used with him.  (Pls.' 56.1 Counter. ¶¶ 20, 22.)  However, Plaintiffs again fail to cite to admissible evidence in support of the proposition that this information was not shared with them as required by Local Rule 56.1(d).  Plaintiffs' denial in their unsworn Rule 56.1 Statement does not create a dispute of material fact.

Plaintiffs point to a document titled "FBA Data Collection Sheet" that allegedly reflects detailed daily notes written by C.T.'s teaching assistant for the time period from January 26, 2012 through February 8, 2012, and additional notes regarding his behavior on February 9,

---

[7] In the few instances where Plaintiffs fail to cite to admissible evidence for the proposition that certain information was not shared with them, but merely allege in their pleadings and 56.1 Statement, that "the record does not reflect" that such information was shared, the Court may deem the challenged fact as undisputed.  *Holtz*, 258 F.3d at 73 (holding that the court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the court's attention).  The Court here recounts Plaintiffs' allegations but will not weigh them in determining whether there is genuine dispute of fact.

2012.[8]  The notes recorded by the teaching assistant included statements that it was a "[w]aste

for him to be here . . . hardly does any work at all," that he engaged in "lots of randomly

inappropriate vocalization and behavior," "lots of spacing out" and would "[m]elt down" during

class.  (Asher Decl. Ex. 14 ("FBA Data Collection Sheet").)  The notes for January 31, 2012

reported that C.T. "went to the nurse for lunch—the nurse was out [and] he entered the cabinet

---

        [8] Defendant objects to Plaintiffs' reliance on Plaintiffs' Exhibits 14 and 16 attached to
Asher's declaration.  These exhibits were entered into evidence before the IHO respectively as
Plaintiff Parents' Exhibits 51 and 52.  Plaintiffs' Exhibit 14 was also entered as District's Exhibit
37 before the IHO, and Plaintiffs' Exhibit 16 was proposed as District's Exhibit 38 but ultimately
not introduced into evidence until later in the proceeding as Plaintiff Parents' Exhibit 52.  (Def.'s
56.1 Counter. ¶¶ 23–27.).  These exhibits were produced to Plaintiff Parents by Defendant during
discovery.  Exhibit 14 was described during the IHO hearing as written notes made by C.T.'s
teaching assistant for the period from January 26, 2012 through February 8, 2012, and Exhibit 16
was described as notes from February 9, 2012.  (IHO Tr. 1225–36; Pls.' 56.1 Counter. ¶ 23;
Def.'s 56.1 Counter. ¶ 23.)  Defendant, which produced these documents to Plaintiff Parents and
introduced them into evidence during the administrative hearing, now argues that the author of
these notes is not identified, that "these documents may have been mistakenly included among
materials supplied to the Plaintiff Parents relating to another student," and that therefore Plaintiff
Parents fail to point to admissible evidence for the allegations they seek to support with Exhibits
14 and 16.
        Although, "[t]he principles governing admissibility of evidence do not change on a
motion for summary judgment" and district courts need only consider admissible evidence in
ruling on a motion for summary judgment, *Raskin v. Wyatt Company*, 125 F.3d 55, 66 (2d Cir.
1997), "a plaintiff need not introduce evidence in a form that would be admissible at trial in
order to survive a motion for summary judgment . . . ," *Murphy v. Metropolitan Transp.
Authority*, 548 F. Supp. 2d 29, 42 (S.D.N.Y. 2008) (*citing Celotex v. Catrett*, 477 U.S. 317, 324
(1986) ("We do not mean that the nonmoving party must produce evidence in a form that would
be admissible at trial in order to avoid summary judgment.").)  "[W]hen the evidence offered in
opposition to [a motion . . . for summary judgment] is defective in form but is sufficient to
apprise the court that there is important and relevant information that could be proffered to defeat
the motion, summary judgment ought not to be entered."  *Liberty Mut. Ins. Co. v. Rotches Pork
Packers, Inc.*, 969 F.2d 1384, 1389 (2d Cir. 1992) (alterations and internal quotation marks
omitted).  The Court will thus consider the contents of Plaintiff Parents' Exhibits 14 and 16 and
Plaintiff Parents' testimony about these documents before the IHO inasmuch as they "show the
existence of facts, which may be proved by competent evidence at trial that would allow a
reasonable jury to return a verdict in [Plaintiffs'] favor."  *Murphy*, 548 F. Supp. 2d at 42.  The
Court notes that unlike in instances where Plaintiffs offer no admissible evidence whatsoever and
rely solely on their unsworn Rule 56.1 Statement, here Plaintiffs point to Exhibits that were
introduced and considered during the administrative proceedings.

[and] ate all the candy from the cabinet." (*Id*.) The February 9, 2012 notes reported that C.T. was "[m]aking very inappropriate hissing noises" so that "[e]ven the kids told him to stop" and that he was "[w]riting on his arm" during English class. (Asher Decl. Ex. 16 ("Feb. 9 Notes").) K.C. testified that she first saw these notes while preparing for the due process hearing in 2014 and that no one from the school contacted her to report C.T.'s behavior at the time these events occurred. (IHO Tr. 1225–36.) The teaching assistant did not participate in C.T.'s CSE meetings during the 2011–12 school year. (Pls.' 56.1 Counter. ¶ 30.)

The Parties dispute whether Plaintiffs received a "Confidential Student Report" dated March 29, 2012. The District teachers produced a ten-page Confidential Student Report on or about March 20, 2012 that included individual reporting from each of C.T.'s teachers. (Asher Decl. Ex. 39 ("Confidential Student Report").) C.T.'s social studies teacher noted that C.T. "rarely" completed homework or worked independently, and that he was only "sometimes" able to function as required. (*Id*. at 1.) C.T.'s art teacher wrote, "I have seen quite a change in C.T. in recent days. I do not see the happy, confident student who started with me at the beginning of the 3rd quarter." (*Id*. at 4) C.T.'s science teacher wrote that C.T. "rarely takes good notes," and that at times, "C.T. is more lethargic and will put his head down on the desk during class". (*Id*. at 5–6.) C.T.'s English teacher gave C.T. a score of "never" in the following assessment categories: "academic skills meet course expectations," "takes good notes," "organized," "asks for help," "consistently completes homework," and "meets deadlines." (*Id*. at 9–10.) Wright claims that the packet provided to Plaintiffs at the May 1, 2012 and June 1, 2012 CSE meetings contained the Confidential Student Report. (Wright Aff. at ¶ 14.) Plaintiffs counter that the "record does not demonstrate that this report was ever discussed with [them] at any time during the 2011–2012 school year." (Pls.' 56.1 Counter. ¶ 67.) Plaintiffs again fail to cite to admissible

17

evidence in support of the proposition that this information was not shared with them as required by Local Rule 56.1(d). Plaintiffs' unsupported denial in their unsworn Rule 56.1 Statement does not create a dispute of material fact.

Another document Plaintiffs point to is a June 4, 2012 email, in which C.T.'s English teacher, Ms. Wolff ("Wolff"), told the school psychologist, Sclafani, and Keegan that Plaintiff C.T., "is not prepared to participate in class and doesn't have the required materials. He calls me names and then takes his pencil and pretends to shoot me. He also makes inappropriate hand gestures. Some of the girls are getting upset about this . . ." (Asher Decl. Ex. 70 ("Wolff Email").) Wolff also noted that she "noticed his behavior worsen over the past two weeks" and that "[s]ocially things seem to have deteriorated for him." (*Id*.) K.C. testified that she was not informed of any of the incidents mentioned in Wolff's email at the time they occurred and that she did not see this email until 2014. (IHO Tr. 1245–52.)

The Parties also dispute whether Plaintiff Parents received an end-of-year progress report. C.T.'s February IEP stated that Parents would receive progress reports on IEP goals four times a year. (February 15, 2012 IEP.) Plaintiff Parents allege they never received an end-of-year progress report on IEP goals. (IHO Tr. 1305–08.) Instead, they received an IEP Progress Report purporting to date from June 2012, but containing a cover letter dated June 3, 2014, for the first time in July 2014 as part of the due process hearing educational records production. (Asher Decl. Ex. 43 (June 2012 IEP).)

### 4. C.T. at Westfield

C.T. was unilaterally placed by Plaintiff Parents in a private school, the Westfield Day School ("Westfield"), for the 2012–13 school year. (Def.'s 56.1 ¶ 4.) Although Plaintiffs allege that C.T. received more one-on-one instruction and emotional support at Westfield, so that his

grades and wellbeing improved, and although the IHO held that Westfield was an "appropriate

placement," (Comp. at 19, 31–32), Defendant points to evidence that C.T. continued to struggle

with attendance at Westfield. Indeed, in a January 25, 2013 Progress Report issued by

Westfield, C.T.'s history teacher commented that C.T. was "not really capable of maintaining

himself" during class and would leave for the majority of it, spending no more than "15 minutes

at a time" in class. (Def.'s 56.1 ¶ 59.) In that same report, C.T.'s science teacher commented

that C.T. "exhibited inappropriate and extremely disruptive behavior" so that he could not "stay

in class for [a] significant amount of time." (Def.'s 56.1 ¶ 60.) His academic support teacher

commented that C.T. required "frequent breaks" and was "unable to meet academic demands."

(Def.'s 56.1 ¶ 62.)

     B. Administrative Proceedings

This Court discussed the administrative proceedings in this case at length in its Opinion

& Order Denying Defendant's Motion for Judgment on the Pleadings (June 1, 2017 Opinion &

Order.) In summary, on May 27, 2014, Plaintiffs filed an administrative due process complaint,

seeking, under the IDEA, reimbursement for compensatory education for the District's alleged

failure to provide a FAPE during the 2011–2012 school year, and tuition reimbursement for

C.T.'s placement at Westfield during the 2012–2013 school year. (Def.'s 56.1 ¶ 12; June 1, 2017

Opinion & Order 5.) Plaintiff Parents also sought a declaration that the District's IEP violated

Section 504 and that the District's conduct constituted discrimination under Section 504 and

Title II of the ADA. (Def.'s 56.1 ¶ 13.)

On June 10, 2014, Plaintiffs made an educational records request of the District. (Def.'s

56.1 ¶ 16.) On or about July 18, 2014, the District provided Plaintiffs 844 pages of documents.

(Def.'s 56.1 ¶ 18.) On July 27, 2014, after receipt of the educational record was complete,

Plaintiffs served the District with the Amended Due Process Complaint Notice which included a claim that the District failed to provide them adequate information to allow them to participate in the IEP-development process.  (Pls.' 56.1 Counter. ¶ 127; June 1, 2017 Opinion & Order 6.)

A due process hearing commenced on October 16, 2014 and continued on six additional hearing dates: October 21, 2014, November 5, 2014, February 26, 2015, March 19, 2015, March 25, 2015, and June 17, 2015.  (Pls.' 56.1 Counter. ¶ 128.)

On January 11, 2015, the IHO issued an Interim Decision wherein she determined that the "appropriate mechanism" for raising Section 504 and ADA claims distinct from the IDEA claims would be via the District's Policy 3040, which instructs parents to file a grievance with the District's Assistant Superintendent for Human Resources.  The IHO then noted that Plaintiffs had, in fact, referred the Section 504 and ADA claims to the appropriate entity.  (June 1, 2017 Opinion & Order 6 (citing IHO Interim Decision 4).)

On November 4, 2015, the IHO rendered a final decision, ruling in Plaintiffs' favor on all remaining claims.  In her decision, the IHO dismissed the District's argument that all of the claims arising from the 2011–12 school year were time barred by the two-year statute of limitations.  (June 1, 2017 Opinion & Order 6 (citing IHO Decision 73).)  The IHO reasoned that C.T.'s mother had "established that the basis of their claim did not begin to accrue until 2014 when she became aware that the District withheld material information pertaining to C.[T.]'s education," and concluded that the claim was therefore tolled.  (*Id.*)

The District subsequently appealed the adverse decision to the SRO.  On January 7, 2016, the SRO issued a decision reversing the IHO's decision in its entirety.  With respect to the statute of limitations regarding the IDEA claims raised for the 2011–12 school year, the SRO rejected Plaintiffs' argument that their claims had been tolled because of the District's withholding of

material, saying that the hearing record showed "that the [P]arents knew or had reason to know about the student's attendance issues and behaviors," and that Plaintiffs were aware of most of the information underlying their claims "as of the February 2012 CSE meeting at the latest." (June 1, 2017 Opinion & Order at 7 (citing SRO Decision 13–14).)  The SRO did not address the IHO's decision not to consider the Section 504 or ADA claims.  (*Id.*)

### C.  Procedural History

Plaintiffs commenced this Action on April 27, 2016, raising the same IDEA claims asserted in their administrative due process claims and rejected by the SRO, and also asserting the Section 504 and ADA claims that the IHO declined to consider.  (*See* Compl. (Dkt. No. 1).) Defendant filed its Answer on June 17, 2016, (*see* Dkt. No. 9), after which Defendant filed a letter requesting a pre-motion conference to set a schedule for the ordinary summary judgment motion practice that occurs in IDEA cases, (*see* Dkt. No. 11).  After the Court scheduled the conference, Defendant wrote another letter requesting that the Court also take up at the conference a motion by Defendant to amend its Answer to include a statute of limitations defense to the Section 504 and ADA claims.  (*See* Dkt. No. 14.)

The Court thereafter held a conference on September 23, 2016, (*see* Dkt. (minute entry for Sept. 23, 2016)), wherein Defendant expressed a desire to move for Judgment on the Pleadings with respect to the Section 504 and ADA claims asserted as the Fourth and Fifth causes of action in Plaintiffs' Complaint.  Upon request by the Court, Plaintiffs submitted a letter on September 30, 2016, outlining their arguments for why the Section 504 and ADA claims— which are subject to a three-year statute of limitations, relate to events in 2012, and were not filed until 2016—are not time barred.  (*See* Dkt. No. 16.).  Defendant filed a response on October 3, 2016, (*see* Dkt. No. 17), and filed its Amended Answer with counterclaims on October 6,

2016, (*see* Dkt. No. 19). The Court thereafter set a briefing schedule for Defendant's Motion for Judgment on the Pleadings, (*see* Dkt. No. 22), and Plaintiffs filed their Answer to Defendant's counterclaims on October 24, 2016, (*see* Dkt. No. 23).

On June 1, 2017 the Court issued an Order & Opinion denying Defendant's Motion for Judgment on the Pleadings, finding that discovery was needed in order to ascertain the timeliness of both the IDEA claims and the Section 504 and ADA claims relating to the 2011–2012 school year. (*See* June 1, 2017 Opinion & Order.) On June 24, 2017, the Court adopted a Discovery Scheduling Order that set a discovery end date of October 27, 2017. (*See* Dkt. No. 42.) On November 17, 2017, after discovery closed, Defendant filed a pre-motion letter indicating the grounds on which they would move for summary judgment. (Dkt. No. 44.) On November 28, 2017, Plaintiffs filed a letter seeking leave to file their first amended complaint and requesting that the Court direct that Defendant's summary judgment motion on the statute of limitations question be briefed and decided first. (Dkt. No. 46.) On December 6, 2017, Defendant agreed to Plaintiffs' request regarding summary judgment motion practice, (Dkt. No. 48), and on December 7, 2017, the Court adopted a briefing schedule and adjourned any conferences pending submission of the briefs, (Dkt. No. 49). On December 13, 2017, Plaintiffs filed the operative First Amended Complaint. (Dkt. No. 52.) Defendant filed an Answer on December 22, 2017. (Dkt. No. 53.)

Defendant filed the instant Motion for Summary Judgment, accompanying papers and exhibits, and a Rule 56.1 Statement on February 2, 2018. (Not. of Mot. (Dkt. No. 54); Def's. Mem. Law. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (Dkt. No. 55); Rushfield Aff.; Def.'s 56.1.) Plaintiffs filed their Opposition to the Motion with the accompanying memorandum of law, a response to Defendant's Rule 56.1 Statement, and a Rule 56.1 Counterstatement on March

12, 2018.  (Pls.' Memo. in Opposition to Mot. for Summ. J. ("Pls.' Mem.") (Dkt. 67)); Pl.'s 56.1

Resp.; Pls.' 56.1 Counter.)  Plaintiffs' counsel filed a declaration and accompanying exhibits on

March 16, 2018.  (Asher Decl. (Dkt. No. 77).)  Defendant filed a reply and accompanying

papers, as well as a Rule 56.1 Counterstatement on May 9, 2018.  (Def.'s Reply Mem. Of Law in

Further Supp. of Mot. for Summ. J. ("Def.'s Reply") (Dkt. No. 82); Def.'s 56.1 Counter. (Dkt.

No. 83).)  On August 17, 2019, the Court ordered supplemental briefing, (Dkt. No. 85), and on

August 24, 2018, both parties submitted their additional letter briefs, (Dkt. Nos. 86, 87).

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same).  "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper*

*Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014)

(same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy*

*Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v.*

*Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the nonmovant's claim," in which case "the nonmoving party must come

forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Group of Am.,*

*Inc.,* 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal quotation marks omitted)).

### B.  Analysis

Defendant claims that Plaintiffs First through Third Causes of Action in the Amended Complaint are time-barred through to May 25, 2012 and that their Fourth and Fifth Cause of Action in the Amended Complaint are wholly time-barred.  Over the course of this litigation, Defendant has proposed several dates on which Plaintiffs allegedly learned of, or "knew or should have known" of, the injuries that gave rise to their claims.  Specifically, Defendant argues that Plaintiffs' Section 504 and ADA claims accrued no later than June 30, 2012, "but more likely as early as February 2012."  (*See* Def.'s Mem. 7.)  Defendant also argues, for the first time in its Reply, that all of Plaintiffs' claims accrued no later than May 1, 2012.  (*See* Def.'s Reply 10.)

Plaintiffs have consistently alleged that their claims did not accrue until 2014 when in response to their educational records request they received hundreds of additional documents,

such as attendance records and internal school communications, detailing the full extent of C.T.'s absences from class and his disconcerting behavior in class. (*See* Pls.' Mem. 1.)

The IHO concluded Plaintiffs' claims did not accrue until 2014, when Plaintiffs received additional material information pertaining to C.T.'s education. (IHO Decision 73.) The SRO concluded that Plaintiffs were aware of most of the information underlying their claims as of February 2012. (SRO Decision 13–14.) This Court previously held in its June 1, 2017 Opinion & Order that the SRO's findings regarding Plaintiffs' knowledge of the operative facts of the IDEA claims were not entitled to deference. (*See* June 1, 2017 Opinion & Order.) The Court concluded that the fact that the SRO found that Plaintiffs' IDEA claims—and, by extension, their Section 504 and ADA claims—accrued in early 2012, was neither dispositive nor entitled to deference. (*Id.* at 17–20.)[9] The Court reviews the statute of limitations issue de novo.

---

[9] In summary, in IDEA cases, the general rule is that some measure of deference is owed to the conclusions of the SRO because the Court "is not an expert on education or childhood learning disabilities." *S.A. ex rel. M.A.K. v. N.Y.C. Dep't of Educ.*, No. 12-CV-435, 2014 WL 1311761, at *1 (E.D.N.Y. Mar. 30, 2014); *see also L.K. v. Dep't of Educ. of the City of N.Y.*, No. 09-CV-2266, 2011 WL 127063, at *1 (E.D.N.Y. Jan. 13, 2011) ("The SRO's findings of fact are due appropriate deference by th[e] [c]ourt, which is not an expert on education or childhood learning disabilities."). The Second Circuit has held, however, that while deference is generally owed to the SRO's decision, the level of deference depends on the type of issue being decided, *see M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012) (holding that "the weight due administrative determinations . . . will vary based on the type of determination at issue"), and courts have accordingly held that "the question of the weight due the administrative findings of fact[] should be left to the discretion of the trial court," *M.S. v. N.Y.C. Dep't of Educ.*, No. 13-CV-3719, 2013 WL 6028817, at *4 (E.D.N.Y. Nov. 13, 2013) (internal quotation marks omitted); *see also R.H. v. Bd. of Educ. of Saugerties Cent. Sch. Dist.*, No. 16-CV-551, 2017 WL 401237, at *2 (N.D.N.Y. Jan. 30, 2017) (same). Thus, "[a]lthough [the Court] must give due weight to the state proceedings, mindful that [it] lack[s] the specialized knowledge and experience necessary to resolve questions of educational policy, [it] need not defer to the findings of state administrative officers on questions . . . that fall outside of their field of expertise." *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 456–57 (2d Cir. 2014) (citation and internal quotation marks omitted).

The question of when Plaintiffs' claims accrued does not implicate the SRO's "greater educational expertise." *M.H.*, 685 F.3d at 246. Accordingly, where "the issue on review is the application of the IDEA's statute of limitations," the Court is called upon "to interpret the

1. First, Second, and Third Causes of Action

By their First, Second, and Third Causes of Action, Plaintiffs allege Defendant failed to

provide C.T. with a FAPE pursuant to the IDEA, 20 U.S.C. § 1415 *et seq*., New York Education

Law, N.Y. Educ. Law §§ 4401, 4404, 4410, and Section 504 of the Rehabilitation Act, 29 U.S.C.

§ 794 *et seq.*

The IDEA applies a two-year statute of limitations to complaints asserting a FAPE

violation. *See* 20 U.S.C. § 1415(b)(6)(B) (noting that administrative complaint may assert "an

alleged violation that occurred not more than 2 years before the date the parent or public agency

knew or should have known about the alleged action that forms the basis of the complaint

. . . . "); *id*. § 1415(f)(3)(C) (providing that due process hearing must be requested "within 2

years of the date the parent or agency knew or should have known about the alleged action that

forms the basis of the complaint . . . ."); *Somoza v. N.Y.C. Dep't of Educ.*, 538 F.3d 106, 114 n. 7

_____

statutory provisions and the law regarding claim accrual," which "does not implicate educational
policy decisions." *K.H. v. N.Y.C. Dep't of Educ.*, No. 12-CV-1680, 2014 WL 3866430, at *15
(E.D.N.Y. Aug. 6, 2014). Because issues regarding when the statute of limitations began to run
"fall within the purview of the lawyer's expertise, not that of the educator," *id.* (internal
quotation marks omitted), deference is not owed to the SRO's determination regarding the
accrual of Plaintiffs' claims, whether under the IDEA, Section 504, or the ADA, *see id.*; *See also
R.B. ex rel. A.B. v. N.Y.C. Dep't of Educ.*, No. 10-CV-6684, 2011 WL 4375694, at *3–4
(S.D.N.Y. Sept. 16, 2011) (noting, in the context of an IDEA claim in which a statute of
limitations defense was raised, that "where the administrative decision concerns an issue of law,
the district court need not adhere to the . . . rule of deference," and reviewing the statute of
limitations issue de novo), *reconsideration denied*, 2012 WL 2588888 (July 2, 2012), *mot. to set
aside judgment denied*, 2013 WL 1890263 (Apr. 11, 2013). This conclusion accords with the
Second Circuit's instruction that where deference is due to a state administrative agency, "it is
not because of the factfinder's status as a state agency, but because of the factfinder's inherent
expertise on technical matters foreign to the experience of most courts." *Bartlett v. N.Y. State
Bd. of Law Exam'rs*, 156 F.3d 321, 327 (2d Cir. 1998) (internal quotation marks omitted),
*vacated*, 527 U.S. 1031 (1999) (on remand, the Second Circuit reaffirmed its holding regarding
the deference owed to state administrative agencies, *see Bartlett v. N.Y. State Bd. of Law
Exam'rs*, 226 F.3d 69, 78 (2d Cir. 2000) ("[F]or the reasons stated in [the prior opinion], we hold
that the Board is not entitled to deference on the question of whether [the plaintiff] suffers from a
disability under the ADA and the Rehabilitation Act . . . .")).

(2d Cir. 2008) (holding that IDEA claims for the denial of a FAPE are subject to a two-year statute of limitations); *M.D. v. Southington Bd. of Educ.*, 334 F.3d 217, 221–22 (2d Cir. 2003) (same, prior to the IDEA'S 2005 amendment); *Piazza v. Florida UFSD*, 777 F. Supp. 2d 669, 687–88 (S.D.N.Y. 2011) (same).

This limitations period, by its express terms, only governs the time required to bring a complaint in state and local administrative proceedings. *See, e.g.*, *French v. N.Y. State Dep't of Educ.*, No. 04-CV-434, 2010 WL 3909163, at *4–5 (N.D.N.Y. Sept. 30, 2010) (noting that the IDEA applies different limitations periods to claims brought in state and local administrative proceedings and to claims brought in federal court after exhaustion of administrative remedies). The IDEA requires that parties who wish to bring a civil action challenging a state administrative agency's decision do so within either 90 days of the date of decision or within such time as the applicable state law allows. *See* 20 U.S.C. § 1415(i)(2)(B). New York provides that in such circumstances, a party has four months from the date of the agency's decision in which to bring a civil action challenging the agency's determination. *See* N.Y. Educ. Law § 4404(3)(a); *Piazza*, 777 F. Supp. 2d at 688; *J.G. ex rel. J.G. v. Bd. of Educ.*, No. 07-CV-7245, 2008 WL 3843523, at *2 (S.D.N.Y. Aug. 14, 2008).

IDEA claims accrue "on the date that a plaintiff or his parent 'knew or should have known about the alleged action that forms the basis of the complaint.'" *See Somoza*, 538 F.3d at 114 (quoting 20 U.S.C. § 1415(b)(6)(B)); *Piazza*, 777 F. Supp. at 689 (same)). Determining when a parent knew or should have known "is necessarily a fact-specific inquiry." *K.H. v. N.Y.C Dep't of Educ.*, No. 12-CV-1680, 2014 WL 3866430, at *16 (E.D.N.Y. Aug. 6, 2014).

Depending on the specific facts of the case, IDEA plaintiffs have been found to have known or to have had reason to know a student was being denied a FAPE when: (1) plaintiff

requested a different placement or additional educational support for the student and their request was denied by the district, *see, e.g.*, *Avaras v. Clarkstown Cent. Sch. Dist.*, No. 15-CV-2042, 2017 WL 3037402, at \*14–15 (S.D.N.Y. July 17, 2017) (holding that the plaintiff was aware of the district's failings that gave rise to her claims when at the annual review the CSE recommended the same programs and IEP for the next academic year despite the plaintiff's repeated objections); *see also Bd. of Educ. of N. Rockland Cent. Sch.Dist. v. C.M.*, No. 17-2406, 2018 WL 3650185, at \*2 (2d Cir. Aug. 1, 2018) (holding that the plaintiffs' claims accrued when district denied their request for a residential placement for the next school year at the end-of-year CSE meeting where the parents and the student's psychotherapist insisted the student required a residential placement);[10] (2) when the plaintiffs unilaterally removed the student form school and placed him or her in a new program, *see, e.g., M.D.*, 334 F.3d at 221 (holding that plaintiffs "knew or had reason to know" of their injury when they withdrew their child from the district because they believed that the district was not providing an adequate education); *Keitt v. N.Y.C.*, 882 F. Supp. 2d 412, 437 (S.D.N.Y. 2011) (concluding that plaintiff "knew or had reason to know" that the student was being denied an appropriate education when he was withdrawn from public school in the eighth grade) (*adopting Report and Recommendation*);[11] *R.B.*, 2011 WL 4375694, at \*4 (finding that IDEA claim accrued when the plaintiff withdrew child from local school district, and unilaterally enrolled child at a non-district school of their choice with the intention of seeking reimbursement); (3) plaintiffs noticed the student making improvements in the new program, *see, e.g., Somoza*, 538 F.3d at 114 (holding that the plaintiff "knew of should

---

[10] The Court recognizes that this is a non-precedential summary order and cites it only as supporting authority.

[11] This Opinion adopts the Magistrate Judge's Report and Recommendation in full. The Report and Recommendation is not separately published on Westlaw but is copied in full at the end of the Opinion. All citations herein are to the Report and Recommendation.

have known" about the alleged denials of a FAPE when she first "observed her daughter's rapid improvement" in a private education program); *C.B. v. Pittsford Cent. Sch. Dist.*, No. 08-CV-6462, 2010 WL 1533392, at *13 (W.D.N.Y. Apr.15, 2010) (holding that IDEA claim accrued when the plaintiff first hired an educational consultant and became aware that her son's IEP failed to provide support for his learning disability); *K.P. v. Juzwic*, 891 F. Supp. 703, 716–17 (D. Conn. 1995) (holding that the plaintiff did not discover his injury until he entered a new placement where his "substantial gains . . . indicated that he had the capacity to develop life skills, and vocational skills and attain academic goals previously thought impossible"); or (4) even years after the alleged injury occurred, key information, such as a new diagnosis, becomes available to the plaintiffs, *see, e.g, Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1288 (11th Cir. 2008) (holding that IDEA claim did not accrue when parents consented to child's placement in special education program because the parents "did not have the critical facts to know that [the plaintiff] had been injured by this placement until they received the results of the testing"); *K.H.*, 2014 WL 3866430, at *18 (holding that the plaintiff's claim accrued not when his guardians consented to special education placements and attended annual IEP meetings, but years later when he was diagnosed for the first time with several learning disabilities). Courts that have held that claims accrue when new information becomes available have done so in part because they refuse to hold that families "should be blamed for not being experts about learning disabilities." *K.H.*, 2014 WL 3866430, at *18 (quoting *Draper*, 518 F.3d at 1288).

Under the IDEA, a parent lacks the requisite knowledge where he or she was prevented from requesting a hearing because of "(i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or (ii) the local educational agency's withholding of information from the parent that was required under this

subchapter to be provided to the parent." 20 U.S.C. § 1415(f)(3)(D). If either exception applies, the statute of limitations is tolled. *See Y.A. v. N.Y.C. Dep't of Educ.*, No. 15-CV-5790, 2016 WL 5811843, at *8–10 (S.D.N.Y. Sept. 21, 2016) (holding that the two-year statute of limitations for IDEA claim tolled where the plaintiff parents were denied "reasonable access" to the student's school records such as progress reports and IEP evaluations, because the district did not produce documents and the IHO refused to sign subpoena ordering production). The IDEA expressly allows an "opportunity for parents of a child with a disability to examine all records relating to such child . . . ." 20 U.S.C. § 1415(b)(1). The Second Circuit has held that this entitles parents to "reasonable" records access. *See Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 787–88 (2d Cir. 2002) (holding that denying the plaintiff access to various medical records, counseling records, and test results while plaintiff's child was being evaluated for an emotional disability infringed upon the plaintiff's right to reasonable information).

### a. Application

Defendant argues Plaintiffs' First, Second, and Third Causes of Action, which are subject to a two-year statute of limitations, should be time-barred through to the period of May 25, 2012. (Def.'s Mem. 1.) If Plaintiffs learned of the alleged injuries in 2014 their claims would have been timely. If Plaintiffs learned of the injury in February 2012, as Defendant alleges they did, Plaintiffs' claims would not have been timely. The Court notes that under Defendant's proposed June 30, 2012 accrual date, Plaintiffs claims may still have been timely.[12] The first step in

---

[12] It is not entirely clear how Defendant picked the May 25, 2012 and June 30, 2012 dates. Defendant states in its Memorandum of Law that June 30, 2012 was the end of the 2011–12 school year. (Def.'s Mem. 7.) The Court finds no explanation for the May 25, 2012 date in Defendant's filings but Notes that Plaintiffs filed their Due Process Complaint Notice on May 27, 2014.

analyzing whether Plaintiffs' claims are time-barred is to determine when Plaintiffs "knew or should have known" about the alleged IDEA violation.

Defendant finds support for its argument that Plaintiffs knew that C.T. was being denied a FAPE in February 2012 or at the latest in June 2012 in the undisputed fact that Plaintiffs removed C.T. from the District at the end of the 2011–12 school year and unilaterally placed him in a private school. (Def.'s 56.1 ¶ 4.) Moreover, Plaintiffs requested additional education support and a different placement for C.T. at CSE meetings as early as February 2012, and again in June 2012, and their requests were denied both times. (IHO Tr. 42–49, 150, 154–56, 1247, 1175.)

Plaintiffs, on the other hand, allege that key information was withheld until 2014. The Parties dispute whether Plaintiffs knew of C.T.'s excessive class-by-class absences. Defendant points to the fact that Plaintiffs knew that pursuant to C.T.'s IEP, he was permitted to take short breaks from the classroom. (February 15, 2012 IEP.) Moreover, at the February 2012 CSE meeting M.T. specifically expressed concern that C.T. was "missing a lot of class." (Def.'s 56.1 ¶ 55.) However, K.C. testified that she first saw her son's "class-by-class" Attendance Detail record for 2011–12 in 2014 and that "it was really shocking." (IHO Tr. 1151–52.) Flaum testified that C.T.'s class-by-class attendance was never discussed at any of the CSE meetings during the 2011–12 school year. (IHO Tr. 732–33.) C.T.'s tutor, Pearce, also testified that she did not recall any discussion of his attendance. (IHO Tr. 879.) Plaintiffs also point out that they were at times told by Defendant that C.T.'s attendance was improving. (Def.'s 56.1 ¶ 64.)

The Parties also dispute when Plaintiff Parents received "School Attendance Detail" reports. Defendant alleges that the CSE packet provided at the February 15, 2012 CSE meeting included a "Student Attendance Detail" generated on January 31, 2012, (Wright Aff. at ¶ 5c; Q2

Student Period Attendance Detail), and that the CSE packet provided at that May 1, 2012 CSE

meeting also included a "Student Attendance Detail" generated on March 9, 2012, (Wright Aff. ¶

13; All Terms Student Period Attendance Detail.)  Plaintiffs claim they did not see these

document until 2014 after the due process hearing was initiated.  (IHO Tr. 1151–52.)

The Parties also dispute whether Plaintiff Parents received a FBA Worksheet and a PBSP

Worksheet both dated February 10, 2012 at the February 15, 2012 CSE meeting.  The Parties

agree that these documents identified C.T.'s work avoidance and classroom absence as troubling.

Defendant alleges the CSE packet provided to Plaintiff Parents at the February 15, 2012 CSE

meeting included these documents, (Wright Aff. ¶ 5a; FBA; Wright Aff. ¶ 5b; PBSP), but

Plaintiffs testified that these documents were not reviewed at the CSE meeting and they did not

see them until 2014, (IHO Tr. 712, 1237–40).

The Parties also dispute whether Plaintiff Parents accessed C.T.'s class-by-class

attendance record on the District's parent portal.  Defendant points out that Plaintiff Parents

logged into the parent portal 12 times during the 2011–12 school year.  (IHO Tr. 1322–25, 1514,

1516–17, 1523–1535 , 1538–40.)  However, the District's Director of Technology testified that

she was unable to confirm whether Plaintiff Parents ever accessed the Attendance Details.  (IHO

Tr. 1546–49).  Moreover, K.C. testified she had "no idea that there was any more specific

attendance information available" on the parent portal.  (IHO Tr. 1550–53.)

The Parties also dispute whether Plaintiff Parents were aware of the frequent breaks C.T.

took in the nurse's office.  K.C. testified before the IHO that she knew that C.T. sometimes

visited Pollack's office occasionally, (IHO Tr. 1218-1220), but that she did not receive any logs

or reports of exactly how often C.T. visited her office during the 2011–12 school year, (*Id*).

Plaintiffs point to numerous internal school communications detailing disconcerting behavior by C.T. that they allege they did not see until 2014.  (IHO Tr. 1245–52, 1225–36). Among those communications are a June 4, 2012 email from C.T.'s English teacher, (Wolff Email), the "FBA Data Collection Sheet," (FBA Data Collection Sheet), and the February 9, 2012 notes, (Feb. 9 Notes).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr*., 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.") (internal quotation marks omitted).  Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) ("[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court.").  "Although [Plaintiff's] evidence may be thin, [Plaintiff's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact.").

Viewing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, the Court is not able to conclude that a reasonable jury would necessarily find that Plaintiffs "knew or had reason to know" in February, May, or June 2012. It is not for this Court to decide that Parents could or should have accessed the parents portal or reviewed documents handed to them at CSE meetings. A reasonable fact finder could find Plaintiffs' version of events, that they did not learn about their son's class-by-class absences and his teachers' additional concerns until 2014, to be more credible. The Court therefore denies Defendant's Motion on the issue of statute of limitations with respect to Plaintiffs' First through Third Causes of Action.

### 2. Fourth and Fifth Causes of Action

In their Fourth and Fifth Causes of Action, Plaintiffs allege Defendant discriminated against C.T. in violation of Section 504 and Title II of the ADA by permitting him to absent himself from a substantial number of his classes during the 2011–12 school year, by failing to provide him instruction during the times where he was not attending his classes during the 2011–12 school year, and by prohibiting him from riding the bus during a portion of the 2011–12 school year. (Am. Compl. ¶¶ 206–15.)

Section 504 and ADA claims are subject to a three-year statute of limitations in New York, *see M.D.*, 334 F.3d at 224; *Piazza*, 777 F. Supp. 2d at 687, and accrue when the plaintiff "knew or had reason to know of the injury serving as the basis for his claim," *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999). "[T]he proper focus is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful." *Morse v. Univ. of Vt.*, 973 F.2d 122, 125 (2d Cir. 1992) (internal quotation marks omitted). In the context of a Section 504 claim, "when [the] plaintiffs knew or could have known that they were

aggrieved parties presents an issue of fact." *B.D. v. DeBuono*, 130 F. Supp. 2d 401, 426 (S.D.N.Y. 2000). In IDEA cases where plaintiffs seek relief for the denial of a FAPE under statutes other than the IDEA but rely on the same underlying facts regarding the adequacy of a student's education, courts have addressed the timeliness of IDEA, Section 504, and ADA claims, all of which accrue when plaintiffs "knew or should have known" of the injury, together. *See, e.g.*, *K.H.*, 2014 WL 3866430, at *21–22; *Keitt*, 882 F. Supp. 2d at 450–52. These courts have conducted the same "fact-specific inquiry" discussed above in relation to Plaintiffs' First through Third claims.

During the time relevant to the underlying proceedings in this action, the prevailing rule in the Second Circuit was that "[a] plaintiff's failure to exhaust administrative remedies under the IDEA deprives a court of subject matter jurisdiction." *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 481–83 (2d Cir. 2002) ("[P]otential plaintiffs with grievances related to the education of disabled children generally must exhaust their administrative remedies before filing suit in federal court, even if their claims are formulated under a statute other than the IDEA (such as the ADA or the Rehabilitation Act)."). *Polera* and its progeny required plaintiffs to exhaust remedies through the administrative process even when they raised Section 504 and ADA claims that were wholly distinct from those under IDEA and where the standards for recovery were also distinct. *See, e.g.*, *Cave v. East Meadow Union Free Sch. Dist.*, 514 F.3d 240, 248–50 (2d Cir. 2008) (holding that the district court lacked subject matter jurisdiction over ADA, Rehabilitation Act, and § 1983 claims due to the plaintiffs' failure to exhaust IDEA administrative remedies); *Baldessarre v. Monroe-Woodbury Cent. School Dist.*, 820 F. Supp. 2d 490, 502 (S.D.N.Y. 2011) (noting that "the IDEA subjects not only an IDEA cause of action, but any other federal statutory claim seeking relief that would be available under

the IDEA to the same administrative exhaustion requirement" (italics omitted) (quoting 20 U.S.C. § 1415(l)); *Piazza*, 777 F. Supp. 2d at 685–86 (holding that Rehabilitation Act claims must be exhausted pursuant to IDEA's procedures to the extent those claims seek relief that is also available under the IDEA).

Three years after Plaintiffs initiated their IDEA administrative proceeding, the Supreme Court, in *Fry v. Napoleon Community Schools*, 137 S. Ct. 743 (2017), resolved a circuit split regarding when administrative exhaustion of claims alleging the denial of a FAPE brought under statutes other than the IDEA was required. The Supreme Court held that "if, in a suit brought under a different statute, the remedy sought is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not required." *Id*. at 754.[13] "[I]n determining whether a suit indeed 'seeks' relief for such a denial, a court should look to the substance, or gravamen, of the plaintiff's complaint." *Id*. at 752. The Supreme Court instructed courts to ask a pair of questions in order to determine whether the "gravamen" of a plaintiff's complaint concerns the denial of a FAPE:

---

[13] Plaintiffs argue that the retroactive application of the *Fry* standard would produce a substantially inequitable result in this case and cite to *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971), for the proposition that "where a decision of [a court] could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." *Id*. at 107. (Pl.'s Mem. 21.) Plaintiffs fail to mention, however, that the *Chevron* retroactivity test was superseded by the Supreme Court's decision in *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, (1993), which held that when the Supreme Court "applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate the announcement of the rule." *Id*. at 97–98; *see also Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp*., 619 F.3d 207, 215–16 (2d Cir. 2010) (noting that Supreme Court decisions are given full retroactive effect); *Swede v. Rochester Carpenters Pension Fund*, 467 F.3d 216, 220 (2d Cir. 2006) (same). An opinion is retroactive when the Supreme Court does not reserve the question whether its holding should be applied to the parties before it. *Harper*, 509 U.S. at 2517. The *Fry* Court made no such reservation and thus the *Fry* standard applies retroactively to this case.

First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school—say, a public theater or library? And second, could an adult at the school—say, an employee or visitor—have pressed essentially the same grievance?

*Id*. at 756 (internal quotation marks omitted). If the answer to both of those questions is yes, the claim is unlikely to be about the denial of a FAPE. *Id*. If the answer to both of those questions is no, the complaint is likely about the denial of a FAPE. *Id*. Another sign of the gravamen of a suit "can emerge from the history of the proceedings . . . Prior pursuit of the IDEA's administrative remedies may provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE." *Id*.

Claims are tolled during mandatory administrative exhaustion. *See Gonzalez v. Hasty*, 651 F.3d 318, 324 (2d Cir. 2011) ("[T]he applicable three-year statute of limitations is tolled only during that exhaustion period and not during the period in between the accrual of those claims and when [the plaintiffs] began the administrative remedy process."); *Povoski v. Lacy*, No. 14-CV-97, 2016 WL 908899, at *4 (N.D.N.Y. Feb. 8, 2016), *adopted by* 2016 WL 913254 (N.D.N.Y. Mar. 9, 2016) ("Under the Second Circuit's rule, the equitable tolling period begins when a plaintiff first raises his administrative claim, and ends when the plaintiff's administrative remedies are deemed exhausted."); *Rekowicz v. Sachem Cent. Sch. Dist*., No. 11-CV-1561, 2013 WL 4852305, at *6–7 (E.D.N.Y. Sept. 10, 2013) (applying equitable tolling to IDEA administrative exhaustion case).

a.  Application

If Plaintiffs' Section 504 and ADA claims were not for the denial of a FAPE, exhaustion of the IDEA's procedures was not required, and the statute of limitations clock started ticking as of the date Plaintiffs knew or should have known of the alleged injuries. According to Plaintiffs, that date was 2014, so that the statute of limitations did not expire until 2017 and their April 27,

2016 filing was timely. (Pl.'s Mem. 1–2.) According to Defendant that date was February 2012, or May 1, 2012, or June 30, 2012, so that the three-year statute of limitation expired no later than June 30, 2015 and Plaintiffs' filing was not timely.[14]

The Court need not reach the difficult question of whether Plaintiffs' Section 504 and ADA claims were for the denial of a FAPE and exhaustion was required. If exhaustion was required the statute of limitations expired either in May 2015 or May 2016 depending on when Plaintiffs' administrative remedies were exhausted. Whether and when Plaintiffs exhausted their administrative remedies with respect to their Section 504 and ADA claims remains a disputed fact and summary judgment therefore is inappropriate.

On the other hand, if exhaustion was not required, the statute of limitations expired either in 2015 or 2017 depending on when Plaintiffs "knew or should have known" of the violation. As discussed with respect to Plaintiffs' First, Second, and Third Causes of Action, the issue of when Plaintiffs "knew or should have known" that C.T. was being denied a FAPE is in dispute. The

---

[14] Administrative exhaustion of IDEA claims in New York involves two steps: a review of the child's IEP by an IHO, *see* N.Y. Educ. Law § 4404(1), and a possible appeal to a SRO, who may modify any determination made by the IHO, *id.*§ 4404(2). Defendant offers January 11, 2015 as the date on which Plaintiffs exhausted their administrative remedies because that was the date on which the IHO issued an Interim Decision declining jurisdiction over the Rehabilitation Act and ADA claims. (Def.'s Mem. 8; Defs.' Reply 10.) Defendant fails to mention, however, that the IHO's January 11, 2015 Interim Decision held that the "appropriate mechanism" for raising Section 504 and ADA claims was via the District's Policy 3040, or filing a grievance with the District's Assistant Superintendent for Human Resources, and that Plaintiffs had referred those claims to the appropriate entity. The SRO's January 7, 2016 final decision again mentioned that the Section 504 and ADA claims had properly been referred to the District's assistant superintendent. (SRO Decision 6.)

No party has set forth evidence about what steps were taken with respect to the Section 504 and ADA claims after they were referred to the District's Assistant Superintendent. But the Court will not assume, without further evidence, at the summary judgment stage, that Plaintiffs' administrative remedies with respect to their Section 504 and ADA claims were exhausted at the time of an interim IHO decision when there is a subsequent final SRO decision in the record and when that final decision does not conclusively address whether the Section 504 and ADA claims were resolved.

*Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 836 (2d Cir. 2014) (citation and quotation marks omitted). In sum, none of Plaintiffs' arguments persuades the Court not to defer to the SRO's reasoned judgment.

## III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 125), grant judgment to Defendant, and close this case.

SO ORDERED.

DATED:     December 18, 2019
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE